ACCEPTED
01-15-01006-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
12/10/2015 3:42:59 PM
CHRISTOPHER PRINE
CLERK

# NO.  01-15-1006-CV

IN THE COURT OF APPEALS
FOR THE FIRST DISTRICT OF TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
12/10/2015 3:42:59 PM
CHRISTOPHER A. PRINE
Clerk

PROFESSIONAL ADVANTAGE SOFTWARE SOLUTIONS, INC.,
*Appellant*

v.

WEST GULF MARITIME ASSOCIATION INC.,
*Appellee*

Appealed From the 151st Judicial District Court
Harris County, Texas
Trial Court Cause No. 2012-58827,
the Honorable Mike Engelhart, Presiding.

## APPELLANT'S EMERGENCY MOTION FOR TEMPORARY RELIEF

TO THE HONORABLE FIRST COURT OF APPEALS:

Pursuant to Rule 29.3 of the Texas Rules of Appellate Procedure, Appellant

Professional Advantage Software Solutions, Inc. files this Emergency Motion for

Temporary Relief requesting that the Court stay all proceedings in the trial court.

### THE NEED FOR TEMPORARY RELIEF

Appellant Professional Advantage Software Solutions, Inc. ("PA") filed its

Notice of Appeal on November 25, 2015, appealing the trial court's interlocutory

Order Denying PA's Motion to Compel Arbitration and Stay Proceedings, signed November 18, 2015. However trial is currently set for January 18, 2016. Unless the Court grants temporary relief by staying all proceedings, PA will be prejudiced by having to proceed with pre-trial motions and trial while its interlocutory appeal—which could nullify the need for a trial if the case is sent to arbitration—is pending in this Court. Thus, PA requests that this Court stay the proceedings.

## BRIEF FACTUAL BACKGROUND

Appellee West Gulf Maritime Association, Inc. alleges that it hired several companies, including Appellant PA, to replace and upgrade its payroll and benefits processing system.[1] (*See* Tab A, First Amended Petition). Appellee claims that Appellant PA represented that it had software, referred to as Personnel Agency Management module ("PAM module"), which could accomplish Appellee's "goals without the need for extensive and costly modification" or re-inventing the wheel. (*Id.* at ¶ 13). In reliance on these representations, Appellee contends that it signed Appellant PA's Functional Design Specifications ("FDS") and Statement of Work ("SOW") on November 5, 2010. (*Id.* at ¶ 15).

Appellee also agreed to the provisions on the Software License Agreement (the "Agreement"). While neither party executed the Agreement after Appellee received it from Appellant PA, Appellee concedes that "[PA] did indeed license the software to

---

[1] Appellee also sued Business Microvar, Inc. d/b/a Interdyn BMI and Technology Support, Inc.,

2

[Appellant] . . . and "[t]he [Agreement] on one hand and the SOW and FDS on the other, were completely separate free standing contracts." (*See* Tab B, Motion to Compel Arbitration and Stay Proceedings, Exhibit A: Affidavit of Appellee's President and Corporate Representative Nathan Wesely at ¶¶ 21-22). The Agreement provides that Appellant PA grants Appellee the right to "execute and use the Software for [Appellee's] internal business operations . . . ." (*See* Tab B, Motion to Compel Arbitration and Stay Proceedings, Exhibit B: Agreement at ¶ 1(b)). Without the Agreement, Appellee would not have a right to use and evaluate the PAM module.

As part of the Agreement, Appellant PA warranted, in part, that the PAM module's functionality would be free from material defects. (*Id*. at ¶ 3). In its First Amended Petition, Appellee alleges that Appellant PA "breached its contracts with [Appellee] by failing to design and install a fully functional PAM module that would meet [Appellee's] specific requirements." (Tab A at ¶ 33). Specifically, Appellee claims that Appellant PA was unable to provide it with correct overtime calculations and reporting because the PAM could not properly calculate overtime calculations in accordance with Appellee's requirements. (*Id*. at ¶ 25). Thus, Appellee's breach of contract claims flow directly from the Agreement.

The Agreement contains an arbitration provision that provides:

10. ARBITRATION AND GOVERNING LAW

---

but it subsequently settled with these defendants.

3

(a) <u>Disputes</u>. Any dispute, controversy, cause of action, or claim, of any kind or nature whatsoever, whether legal or equitable, including, but not limited to, claims sounding in contract, torts or products liability and claims based upon alleged violations of consumer protection laws, which arise out of or related to (1) this Agreement, or the breach, termination or invalidity of this Agreement, (2) the sale, installation, modification or use of the [PAM module], or (3) any services rendered in connection with the sale, installation, modification, or use of the [PAM module] shall be finally and exclusively settled by arbitration in accordance with the Arbitration Rules of the American Arbitration Association as then in effect by one (1) arbitrator appointed in accordance with such Rules. The place of arbitration shall be Fargo, North Dakota . . . .

(b) <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the state of North Dakota without regard to the choice of law or conflict of law principles.

(*See* Tab B, Agreement at ¶ 10).

Based on this provision of the Agreement, on October 19, 2015, PA filed its Motion to Compel Arbitration and Stay Proceedings. (*See* Tab B).

The trial court denied that motion, specifically stating that the motion was denied "on the basis of waiver by [Appellant PA]." (*See* Tab C, Order). Appellant PA filed a Motion to Stay the Proceedings in which it requested that the trial court stay all proceedings and remove the trial, which is currently set on January 18, 2016, from the trial court's docket during the pendency of the appeal.[2] Appellant PA then took an interlocutory appeal to this Court. *See* TEX. CIV. PRAC. & REM. CODE ANN. 51.016; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 171.098(a)(1); *In re Santander*

---

[2] The trial court denied the Motion to Stay the Proceedings on December 8, 2015. (*See* Tab D, Order Denying Stay).

4

*Consumer USA, Inc.,* 445 S.W.3d 216, 217 (Tex. App.—Houston [1st Dist.] 2013, orig. proceeding) (providing that Texas appellate courts have jurisdiction over interlocutory orders denying a motion to compel arbitration).

Since filing its notice of appeal, Appellant PA has been working diligently to have the record filed in this Court. The reporter's record, containing the November 9, 2015 hearing on PA's Motion to Compel Arbitration and Stay Proceedings, has been transcribed and the court reporter paid. The district clerk's record, which also has been requested and is voluminous, is not yet complete.

## ARGUMENT

### A. This Case is Subject to Arbitration.

The issue pending before this Court is whether the entire case is subject to arbitration. In order for a court to compel arbitration, the party seeking arbitration must show that (1) a valid arbitration agreement exists, and (2) the dispute falls within the scope of that agreement. TEX. CIV. PRAC. & REM. CODE § 171.021. If the answer to both questions is yes, the trial court must compel arbitration. *950 Corbindale, L.P. v. Kotts Capital Holdings Ltd. P'ship*, 316 S.W.3d 191, 195–96 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

Texas public policy strongly favors arbitration. *Id.* The Texas Supreme Court has made clear that a written agreement to arbitrate must be enforced if the claims asserted are within the scope of the agreement. *See, e.g.*, *Cantella & Co. v. Goodwin*,

5

924 S.W.2d 943, 944 (Tex. 1996); *Prudential Sec. Inc. v. Marshall*, 909 S.W.2d 896, 899 (Tex. 1995). A court must compel arbitration "unless it can be said **with positive assurance** that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue." *950 Corbindale*, 316 S.W.3d at 195–96 (quoting *Marshall*, 909 S.W.2d at 899) (emphasis added). Any doubts about arbitrability must always be resolved in favor of arbitration. *Cantella*, 924 S.W.2d at 944; *see also In re Rubiola*, 334 S.W.3d 220 (Tex. 2011) ("When deciding whether claims fall within an arbitration agreement, courts employ a strong presumption in favor of arbitration."). As discussed above, there is a broad arbitration provision in the Agreement, and Appellee's claims fall within the broad language in the provision. Based on Appellee's arguments to the trial court, it does not appear to dispute this fact. (*See* Tab E, Response to Motion to Compel Arbitration and Stay Proceedings).

## B. Appellant PA Has Not Waived Its Right to Arbitration.

Rather, Appellee argues that Appellant PA waived its right to arbitrate. (*Id.*). However, because Texas strongly favors arbitration, there is a strong presumption against its waiver. *See Perry Homes*, 258 S.W.3d at 584. "[T]his hurdle is a high one." *Id.* at 590; *see Richmont Holdings, Inc. v. Superior Recharge Sys., L.L.C.*, 455 S.W.3d 573, 574 (Tex. 2014) (per curiam) (listing numerous cases in which the Texas Supreme Court has found no waiver). "[C]ourts should resolve any doubts as to the

agreement's scope, **waiver**, and other issues unrelated to its validity in favor or arbitration." *Ellis v. Schlimmer*, 337 S.W.3d 860, 862 (Tex. 2011) (emphasis added).

To establish that Appellant PA waived their right to arbitration, Appellee must establish that (1) Appellant PA substantially invoked the judicial process, and (2) Appellee was prejudiced as a result. *See Perry Homes*, 258 S.W.3d at 589–90. To decide whether a party substantially invoked the judicial process, courts look to the totality of the circumstances, considering factors such as when the movant knew of the arbitration clause, how much discovery has been conducted, who initiated it, whether that discovery related to the merits rather than arbitrability or standing, how much of the discovery would be useful in arbitration, and whether the movant sought judgment on the merits. *Id.* at 591–92. But "even substantially invoking the judicial process does not waive a party's arbitration rights unless the opposing party proves that it suffered prejudice as a result." *Id.* at 594. Prejudice, in this context, is "the inherent unfairness in terms of delay, expense, or damage to a party's legal position that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue." *Id.* at 597.

As counsel for Appellant PA argued during the hearing on its Motion to Compel Arbitration and Stay Proceedings, despite the length of time the case has been pending, Appellant PA has not been aggressively litigating the case. (*See* Tab F, Transcript of November 9, 2015 Hearing at 10). Even if Appellant PA had, as counsel for Appellant

7

argued, Appellee could not show that it had been prejudiced. (*See id*. at 5–10, 19). Prejudice in this context means "the inherent unfairness in terms of delay, expense, or damage to a party's legal position that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue." *Perry Homes*, 258 at 597. Nothing of the sort has occurred here. Rather, there is no prejudice to either party in determining the arbitration now. Both parties, however, will be prejudiced if the case goes to trial in January while the case is up on appeal, and this Court concludes that this case is ripe for arbitration.

**C.     Temporary Relief Is Necessary to Preserve Appellant's Rights on Appeal.**

Trial is set in this case for January 18, 2016. PA anticipates that this appeal will still be pending in January 2016. A stay of all proceedings preserves the status quo and protects both the jurisdiction of this Court to rule on the interlocutory appeal and PA's ability to benefit from its contractual right to arbitrate. An appellate court "may make any temporary orders necessary to preserve the parties' rights until disposition of the appeal." *See* TEX. R. APP. P. 29.3; *Oryx Capital Int'l, Inc. v. Sage Apartments, L.L.C.*, 167 S.W.3d 432, 438 (Tex. App.—San Antonio 2005, no pet.) ("When this Court stayed all proceedings in the trial court, the parties and the trial court were ordered to take no further action on the case until they received further orders from this court or we resolved the [interlocutory] appeal."); *see also EnerVest Operating, L.L.C. v.*

8

*Molett*, No. 03-11-00823-CV, 2012 WL 1647991, *1 (Tex. App.—Austin, May 1, 2012, no pet.) (order) (per curiam) (discussing that the "appellant filed an interlocutory appeal from the district court's order denying its motion to compel arbitration [and u]pon the appellant's request, the court of appeals stayed the commencement of trial pursuant to Rule 29.3 pending its disposition of the interlocutory appeal."). A stay of all proceedings is necessary in this case to protect the PA's interests and this Court's jurisdiction.

## CONCLUSION AND PRAYER

For all the reasons set forth herein, Appellant respectfully requests that this Court grant this Motion for Temporary Relief and stay all trial proceedings until conclusion of this interlocutory appeal. Appellant requests all other appropriate relief to which it may be entitled.

Respectfully submitted,

/s/ *Thomas C. Wright*
Thomas C. Wright
State Bar No. 22059400
Natasha N. Taylor
State Bar No. 24071117
**WRIGHT & CLOSE, LLP**
One Riverway, Suite 2200
Houston, TX  77056
(713) 572-4321
(713) 572-4320 (fax)
wright@wrightclose.com
taylor@wrightclose.com

9

*/s/ Jamey L. Voge (w/permission)*
Jamey L. Voge, SBN 24033424
Brian Cooper, SBN 24012451
**STUBER COOPER VOGE PLLC**
2600 Network Blvd., Suite 305
Frisco, Texas  75034
Telephone: (214) 472-2770
Fax: (214) 472-2790
jvoge@scvlaw.net
bcooper@scvlaw.net

**ATTORNEYS FOR APPELLANT
PROFESSIONAL ADVANTAGE
SOFTWARE SOLUTIONS, INC.**

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing motion is in compliance with Texas Rule of Appellate Procedure 9.4 because it contains 1,958 words and has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font for text and 12-point Times New Roman font for footnotes, which meets the typeface requirements.

*/s/ Natasha N. Taylor*
Natasha N. Taylor


## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2015, a true and correct copy of this Motion was forwarded to the following counsel by electronic service.

Timothy McCloskey
Blake Rizzo
Carrigan, McCloskey & Roberson LLP
945 Heights Blvd
Houston, Texas 77008
*tmccloskey@cmrllp.com*
*brizzo@cmrllp.com*

*/s/ Natasha N. Taylor*
Natasha N. Taylor

**APPENDIX**

A.  Plaintiff's Amended Petition

B.  Motion to Compel Arbitration and Stay Proceedings, Exhibit A: Affidavit of Appellee's President and Corporate Representative Nathan Wesely, Exhibit B: Agreement

C.  November 18, 2015 Order

D.  December 8, 2015 Order

E.  Response to Motion to Compel Arbitration and Stay Proceedings

F.  Transcript of November 9, 2015 Hearing

# TAB A

CAUSE NO. 2012-58827

| | | |
|---|---|---|
| WEST GULF MARITIME ASSOCIATION, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | |
| | § | |
| BUSINESS MICROVAR, INC. D/B/A | § | OF HARRIS COUNTY, T E X A S |
| INTERDYN BMI, PROFESSIONAL | § | |
| ADVANTAGE SOFTWARE SOLUTIONS, | § | |
| INC., and TECHNOLOGY | § | |
| SUPPORT, INCORPORATED, | § | |
| | § | |
| *Defendants.* | § | 151st JUDICIAL DISTRICT |

## PLAINTIFF WEST GULF MARITIME ASSOCIATION'S
## FIRST AMENDED ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, PLAINTIFF WEST GULF MARITIME ASSOCIATION ("WGMA") and files this First Amended Original Petition against DEFENDANTS BUSINESS MICROVAR, INC. D/B/A INTERDYN BMI ("BMI"), PROFESSIONAL ADVANTAGE SOFTWARE SOLUTIONS, INC. ("ProFad"), and TECHNOLOGY SUPPORT, INCORPORATED ("TSI") ("collectively, Defendants"), and states as follows:

### I.

### DISCOVERY CONTROL PLAN

1.      Plaintiff requests that Discovery Control Plan III, pursuant to Texas Rule of Civil Procedure 190, be implemented.

### II.

### PARTIES

2.      WGMA is a domestic nonprofit corporation authorized to do and doing business in Houston, Texas. WGMA is represented by Timothy M. McCloskey, Carrigan, McCloskey &

Plaintiff's First Amended Original Petition
Page 1

Roberson, L.L.P., 945 Heights Blvd., Houston, Texas 77008.

3.     BMI is a Minnesota corporation doing business in Houston, Texas. BMI has been served and has appeared herein.

4.     ProFad is a foreign corporation doing business in Houston, Texas. ProFad has been served and has appeared herein.

5.     TSI is a Texas corporation doing business in Houston, Texas. TSI has been served and has appeared herein.

## III.

### VENUE

6.     Venue is proper in Harris County pursuant to Section 15.001 of the Texas Civil Practice and Remedies Code because all or part of WGMA's cause of action accrued in this county, the agreements were executed in Harris County, TSI's principal place of business is in Harris County, and all of the Defendants conduct business in Harris County. The Court has jurisdiction over this matter as WGMA's damages are within the jurisdictional limits of this Court.

## IV.

### FACTUAL BACKGROUND

7.     WGMA is in the business of negotiating and administering multiemployer collective bargaining agreements on behalf of stevedores that employ International Longshoremen's Association labor in the ports from Brownsville, Texas, to Lake Charles, Louisiana. Administration of the collective bargaining agreements includes facilitating the adjudication of grievances under the grievance and arbitration procedure, training workers, and processing payroll. WGMA also provides payroll, human resources, and benefit services to a variety of businesses, including providing assistance and advice on day-to-day personnel issues.

8.     BMI is an IT company that "provides Microsoft Dynamics services and solutions," and boasts that its "world class consulting team" includes "industry specialists that have extensive

Certified Document Number: 62443714 - Page 2 of 16

experience implementing vertical market business intelligence solutions" for many industries. BMI claims to offer "the experience, technical skill, and ability to locally deploy consulting professionals and implement business solutions in a timely and cost-effective manner."

9. ProFad is an affiliate of BMI. ProFad claims to "provide specific industry functionality to staffing organizations to help them improve their performance and the return in their IT investment." ProFad also claims that it has a "number of cross industry solutions designed to help customers by enhancing their Microsoft Dynamics solutions."

10. TSI claims to help "businesses plan and install the most efficient and useful infrastructure to meet their specific needs. It claims that its capabilities include "optimization, routing and switching, wireless/mobility components, client computers, servers, security and storage/data management." *Id.*

11. Originally, WGMA ran its payroll and benefits processing through an IBM AS400 system. In 2010, WGMA decided to upgrade its system to keep up to date with current technology and provide a more streamlined and efficient payroll and benefits processing system. It began interviewing software companies to design, implement, and configure a suitable software program to upgrade WGMA's financial accounting, reporting, and payroll processing. WGMA interviewed several software companies before deciding to enter into a contract with BMI to implement Microsoft Dynamics Great Plains ("GP") and Personnel Agency Management ("PAM") software systems to meet WGMA's needs.

12. In order to facilitate BMI's due diligence, WGMA afforded BMI unrestricted access to WGMA's user and executive teams, in order to enable BMI to understand WGMA's precise needs. WGMA also provided BMI with access to third-party payroll personnel that depended on WGMA. ProFad similarly conducted its own due diligence to understand WGMA's

requirements and whether PAM software could be used to accomplish those specific requirements. BMI and ProFad's due diligence was also conducted to ensure that the architecture of the infrastructure they were providing would support the applications being provided, and to enable BMI and ProFad to provide WGMA with expected costs and a target date on which the System would be fully operational.

13. Throughout the course of their due diligence and negotiations with WGMA, BMI and ProFad made specific representations to WGMA for the purpose of inducing WGMA to enter into contracts with them. BMI and ProFad engaged in frequent conversations with WGMA, in which they aggressively touted their abilities to work with companies similarly situated to WGMA. BMI and ProFad repeatedly represented that ProFad had PAM software that could accomplish WGMA's goals without the need for extensive and costly modification. BMI and ProFad represented that they had installed this particular system on several occasions, and thus, there would be no need to re-invent the wheel with customized software for WGMA. Moreover, BMI and ProFad assured WGMA that if WGMA retained BMI, WGMA would be able to save the cost of customization by utilizing the PAM software, which BMI and ProFad represented would meet all of WGMA's functional business requirements with minimal modification. In fact, BMI insisted that ProFad and the PAM software be used for the WGMA project. WGMA had never heard of either ProFad or PAM, and relied on BMI and its professed expertise in this area. Based on BMI's industry expertise, its relationship with ProFad, and BMI's repeated representations regarding ProFad's and PAM's capabilities, WGMA entered into agreements with BMI and ProFad for the project.

14. On or about October 4, 2012, WGMA entered into an agreement with BMI (the "BMI Agreement"), in which BMI guaranteed that the System would "(a) run a payroll system

Certified Document Number: 62443714 - Page 4 of 16

with at least the same functionality as ["WGMA's] current system," (b) maintain worker records in the payroll system with at least the level of detail as [WGMA's] current system," and (c) run accounting programs for [WGMA] and its affiliated entities and benefit programs." BMI promised that "[t]he accounting systems will be installed and functional by October 31, 2010," and "[t]he payroll system will be live on December 23, 2010." BMI represented that the total cost for the System, including any additional vendors that might be necessary, would be approximately $600,000. The BMI Agreement was modified on November 5, 2010 to change the "go live" date from December 23, 2010 to February 18, 2011, with the understanding that WGMA would be able to process payroll solely using the new System on March 28, 2011. BMI never signed the BMI Agreement.

15. After reviewing ProFad's Functional Design Specifications ("FDS") and Statement of Work ("SOW"), WGMA determined that despite ProFad's purported due diligence, ProFad did not understand WGMA's business and functional requirements. In an effort to assist both BMI and ProFad in better understanding WGMA's functional requirements, WGMA provided BMI and ProFad with a requirements/activities list, yet despite the requirements/activities list and further unfettered access to WGMA, ProFad's SOW and FDS were still incomplete on the day of the anticipated contract signing. WGMA personnel spent an additional couple of days with ProFad's due diligence team working on extensive revisions to ProFad's FDS, and on or about November 5, 2010, WGMA signed the FDS and SOW. ProFad, however, never signed either agreement.

16. On or about October 8, 2010, WGMA also entered into an agreement with TSI (the "TSI Agreement") to provide Infrastructure as a Service ("IaaS") on a private cloud-based platform, including provision and support for computer hardware, computer operating systems,

Certified Document Number: 62443714 - Page 5 of 16

storage, backup, IT user administration, User Help Desk, desktop support, security, and email support. Like BMI and ProFad, TSI also flaunted its qualifications and skill sets and reassured WGMA on a number of occasions that it would be able to provide WGMA with all of its hosting needs. TSI represented that it had the necessary resources and could provide WGMA with a stable platform as it had done with its other customers. TSI represented that it could meet all of WGMA's needs without any problems at a cost of only $4,000 per month.

17.     From the inception, during negotiations, and throughout the entire business relationship between WGMA and the Defendants, the Defendants represented both verbally and in writing that they would provide a complete and functioning System for WGMA. The System, as it turned out, has been a colossal failure.

18.     Not once during the many meetings and telephone conversations between BMI, ProFad and WGMA, did BMI or ProFad even suggest that the GP software was unsuitable for WGMA's business, that it could not be installed in a reasonably functioning form, and that it would require extensive modification and several months of installation lead time—in fact, BMI and ProFad's representations were all directly contrary. It was only after WGMA's internal investigation into GP in December 2010 that WGMA discovered that GP may not be a stable platform, that GP may not be capable of processing the payroll run by WGMA because of architectural limitations inherent in GP, and that extensive modification to PAM would be necessary to meet WGMA's payroll needs. On December 10, 2010, WGMA wrote to BMI expressing its concern that "GP would not be a stable platform and may require, at some point, extensive modification." WGMA expressed "serious questions as to whether Dynamics GP can process payroll with the requirements inherent in [WGMA's] business environment. Moreover,

Certified Document Number: 62443714 - Page 6 of 16

the potential inability of Dynamics GP to meet our requirements is caused by limitations of the architecture of Dynamics GP."

19.     Likewise, at no time during the due diligence process, did ProFad advise WGMA that PAM would need extensive modifications. Both BMI and ProFad repeatedly represented that minimal modifications would be needed, in order to induce WGMA into entering into agreements with them for the project.

20.     BMI and ProFad grossly misrepresented their capabilities and those of the System, in order to induce WGMA to enter into the agreements with them. For example, when asked about how its meeting with WGMA went in September 2010, BMI responded that discussions were ongoing, and that it planned to determine "if and to what extent we have a solution," and that it was BMI's opinion that "we can handle their payroll, but will do some customization to the GP system of course, to make it work." According to Britton Sudduth, a BMI Senior Sales Consultant, the big question for BMI was deciding whether to "propose this deal or not" to WGMA, inquiring of Mr. Wilton of BMI, "Did you have any brilliant brain revelations this weekend on how we're going to make GP work?"

21.     In internal documents, ProFad also demonstrated a low level of confidence that it could deliver on its promises to WGMA. Brent Hitterdal of ProFad specifically inquired whether ProFad knew enough about WGMA's current system to "be sure" that it could promise that the "payroll system and worker records will have the same or more functionality as the current system." Kathi Halvorson of ProFad responded that she was "not happy to agree to limits" as ProFad had "not done a full scoping yet." Ms. Halvorson stated that she had "only spent 12-14 hours" with WGMA, and her estimates were "very high level" and needed to be confirmed. She also stated that she gave an example in a document provided to WGMA, but was "not real

forthcoming with invoicing details and payroll items." Joel Ellingson, also of ProFad, wrote to Ms. Halvorson that ProFad did not really "have much for details on what needs to be done," and that "[i]f these items get very complicated . . . they make take longer." He also cautioned that if "they do get too complicated, we may need to build PAM and other processes specific for them, not generic PAM."

22. None of BMI's and ProFad's concerns about their abilities to deliver a fully functional System were ever communicated to WGMA. When BMI and ProFad finally implemented the System, the System was a total failure. The failure was due primarily to BMI's and ProFad's failure to accurately define WGMA's necessary business and functional requirements, and to provide the resources needed for the System to work properly. The System's inability to meet WGMA's business requirements was or should have been apparent to BMI and ProFad at the outset. BMI and ProFad lacked the appropriate personnel to implement the System, and knew or should have known from the start that the System would not be able to provide WGMA with the functionality that WGMA required.

23. There were several root causes for the failure of the System, including poor consultant resourcing, improper configuration, lack of testing and training, poor communication and documentation, and general avoidance of and disregard for standard project management practices. These were the responsibility of BMI and ProFad, which should have been identified, communicated, and addressed during BMI's and ProFad's implementation of the System.

24. BMI failed to accurately define the business and functional requirements necessary to allow the ERP application suite to go-live as originally agreed. BMI also failed to acknowledge the limitations of the core GP system, despite the fact that BMI knew or should have known that the core GP system would not be able to fulfill WGMA's requirements. Rather than express the

Certified Document Number: 62443714 - Page 8 of 16

limitations of GP to WGMA, BMI moved forward on a project it knew or should have known could not be accomplished. Despite BMI's promises that GP could provide WGMA with the needed functionality, WGMA learned after the October 2011 go-live attempt that the GP system still had major limitations and would require even more modification. For example, WGMA identified the following problems with the System after it went live:

a.  District COPE was calculated at 0.25% of Total Pay; it should have been calculated at 0.1% of Straight Time Pay.

b.  District Service Charge was calculated at 0.1% of Total Pay; it should have been calculated at 0.9% of Straight Time Pay.

c.  Local COPE was deducted for every local with which a worker had an agreement; it should have been calculated only for the local for which the worker worked in the pay period.

d.  Local Service Charges that are a percentage of Net Pay were not calculated correctly in GP because GP did not subtract social security from Gross Pay in calculating Net Pay.

e.  Insurance deductions calculated in GP were usually different than the insurance deductions calculated in the AS400.

f.  Child support deductions were doubled in GP for some workers.

g.  Child support deductions were not the same in GP as in the AS400 for some workers.

h.  Credit union deductions were not the same in GP as in the AS400 for some workers.

i.  For some workers Local COPE was deducted in GP when it was not deducted in the AS400.

j.  For some workers Local COPE was deducted in the AS400 when it was not deducted in GP.

k.  For some workers there was no federal income tax in GP when there was federal income tax in the AS400.

l.  Garnishments such as child support and student loan repayment that are based on net income were different in GP the in the AS400 because of differing federal income tax and because social security was not subtracted in calculating Net Pay.

Certified Document Number: 62443714 - Page 9 of 16

m. Some workers had negative social security withholdings in GP, resulting in higher Net Pay than Gross Pay.

n. Louisiana State Tax was calculated differently in GP than in the AS400.

25. ProFad similarly grossly misrepresented the capabilities of its PAM application, failed to define the limits of its PAM application, and was unable to meet WGMA's requirements for a fully operational system. During the entire process, and continuing to the present, ProFad has been unable to provide WGMA with correct overtime calculations and reporting. From the beginning of the project, the PAM application was unable to process overtime ("OT") calculations in accordance with WGMA's requirements. ProFad was aware of PAM's inability to calculate OT in early 2011. In April 2011, Craig Erickstad, suggested that ProFad develop a custom PAM application to calculate OT in accordance with WGMA's requirements. The custom OT application was in testing from June 2011 to the end of the project. PAM's failure to properly calculate OT was a continuous issue throughout the project that was discussed with WGMA and ProFad personnel on a weekly basis. PAM was subjected to testing on a regular basis, and ProFad, throughout the term of the project, was unable to ever determine a solution for PAM's failure to properly calculate OT. Rather, each week ProFad would simply say to WGMA, "we're working on it."

26. Failed attempts to go live on the dates promised by BMI and ProFad included December 24, 2010, March 31, 2011, and October 4, 2011. Although the System finally went live on January 3, 2012, the PAM application provided by ProFad did not go completely live on January 3, 2012, as the OT issue had not been resolved by ProFad by the go-live date. Rather, in order to calculate OT, WGMA was forced to calculate OT using the old AS400 system and continued to approve the OT using the old AS400 system. In fact, WGMA still uses this duplicative method for calculating OT today due to ProFad's failure to meet WGMA's functional requirements.

Certified Document Number: 62443714 - Page 10 of 16

27.     TSI also lacked the level of expertise necessary to recommend or deploy an IaaS platform as WGMA required, and misrepresented its level of capability in supporting clients with needs similar to that of WGMA. TSI failed to follow standard best practice configuration for Microsoft Windows Active Directory, Exchange email, along with collaboration and personal information management. WGMA experienced significant problems with TSI's platform, including but not limited to, poor customer service and significant cost overruns.

28.     Despite their assurances to the contrary, BMI and ProFad were unable to provide the specific requirements that WGMA needed to run normal operations, such as standardized email, collaboration, timesheet upload, worker garnishments, worker taxes, regulatory reporting, and worker overtime. WGMA, at its own cost, has had to add additional software or custom programming which was not originally specified in the Defendants' budgets, and in some cases has had to hire additional experts to resolve functionality issues such as system configuration, document management, timesheet processing, worker garnishments, and negative pay. As a result, WGMA incurred additional significant delays and cost overruns. In order to operate its business without impacting its customers, WGMA also had to hire temporary workers and independent consultants to assist regular personnel with manual data entry and to process payroll transactions that were not supported by the System as configured.

29.     WGMA incurred significant damages as a result of Defendants' conduct, including the difference between the $600,000 that the System was represented to cost, and the amount it did cost, over $2,000,000; the amount overcharged by ProFad; the cost currently being spent to replace the PAM module by Ignite, which has been estimated at $135,000; the cost of additional personnel to run the BMI system because of the reduced functionality compared to the AS400; the additional personnel costing approximately $250,000 per year for the life of the BMI system; and

Certified Document Number: 62443714 - Page 11 of 16

the difference between the value of what WGMA received in the transaction and the purchase price or value given for it.

V.

**CAUSES OF ACTION**

A.    **BREACH OF CONTRACT (all Defendants)**

30.    WGMA repeats and realleges the allegations set forth above as if the same were set forth more fully and at length herein.

31.    WGMA entered into separate contracts with each of the Defendants. Defendants breached their contracts by failing to provide the goods and/or services promised under their respective agreements.

32.    Specifically, BMI breached its contract by failing to provide a System that would run a payroll system with at least the same functionality as WGMA's current system, maintain worker records in the payroll system with at least the level of detail as WGMA's current system, and run accounting programs for WGMA and its affiliated entities and benefits programs. BMI also failed to have the System installed and functional on the promised dates.

33.    ProFad breached its contracts with WGMA by failing to design and install a fully functional PAM module that would meet WGMA's specific requirements.

34.    TSI breached its agreement to provide an IaaS platform that would meet WGMA's specific requirements, including failing to follow standard best practice configuration for, among other things, Microsoft Windows Active Directory, Exchange email.

35.    WGMA satisfied all conditions precedent and performed all of the requirements under each the contracts prior to the Defendants' breaches. The Defendants' breaches of their contracts caused injury to WGMA, for which WGMA seeks to recover the amount of actual damages resulting from the Defendants' breaches of their contracts. To the extent Defendants

Plaintiff's First Amended Original Petition
Page 12

attempt to avoid liability for their breaches based on contractual disclaimers, waivers, or limitations of liability, they are unenforceable because they are nonexclusive, not conspicuous, fail of their essential purpose, and/or are unconscionable.

## B.     NEGLIGENT/FRAUDULENT INDUCEMENT (BMI and ProFad)

36.     WGMA repeats and realleges the allegations set forth above as if the same were set forth more fully and at length herein.

37.     BMI and ProFad negligently and intentionally misrepresented material facts and or omitted material information for the purpose of inducing WGMA to enter into the contracts with BMI and ProFad. These misrepresentations and/or omissions were knowingly false, and were the type of information on which WGMA would be reasonably expected to rely in its business, and which WGMA did, in fact, rely on to its detriment.

38.     Specifically, BMI and ProFad intentionally and grossly misrepresented their capabilities and those of the System. Although BMI and ProFad were aware that GP and PAM would require significant modifications and customizations in order to meet WGMA's needs, if at all, BMI and ProFad misrepresented to WGMA that GP and PAM would require little or no modification, and that the System would be fully functional and be able to meet WGMA's needs on the agreed upon go live date, when, in fact, BMI and ProFad had no confidence that GP and PAM could do so. BMI and ProFad knew or should have known from the start that the System would not be able to provide WGMA with the functionality that WGMA required.

39.     BMI and ProFad misrepresentations were made negligently and/or fraudulently in order to induce WGMA to enter into agreements with them for the System. WGMA relied on their misrepresentations, and as a result, suffered damages as a proximate result of BMI's and ProFad's misrepresentations and omissions, and seeks recovery of damages proximately resulting

Certified Document Number: 62443714 - Page 13 of 16

therefrom. To the extent BMI and ProFad attempt to avoid liability for their negligent and/or fraudulent misrepresentations based on contractual disclaimers, waivers, or limitations of liability, they are unenforceable because they are nonexclusive, not conspicuous, fail of their essential purpose, and/or are unconscionable.

## C.   BREACH OF EXPRESS AND IMPLIED WARRANTIES (BMI and ProFad)

40.    WGMA repeats and realleges the allegations set forth above as if the same were set forth more fully and at length herein.

41.    BMI and ProFad breached the implied warranties of fitness and merchantability in Sections 2.314 and 2.315 of the Texas Business and Commerce Code (U.C.C.). Both BMI and ProFad new the particular purpose for which the System was required and that WGMA was relying on their skill and judgment to select and furnish a fully functional System that would meet WGMA's precise requirements. Moreover, the System provided by BMI and ProFad was not fit for the ordinary purpose for which such systems are used.

42.    ProFad also breached its express warranty that it would "[p]erform the services and produce the deliverables described [in the SOW] in a professional and workmanlike manner consistent with the highest standards practiced in Professional Advantage's industry."

43.    BMI also breached its express warranty that the System would "(a) run a payroll system with at least the same functionality as ["WGMA's] current system," and (b) maintain worker records in the payroll system with at least the level of detail as [WGMA's] current system."

44.    WGMA suffered damages as a result of BMI's and ProFad's breaches of implied and express warranties, and seeks recovery of damages resulting therefrom. To the extent BMI and ProFad attempt to avoid liability for their negligent and/or fraudulent misrepresentations based on contractual disclaimers, waivers, or limitations of liability, they are unenforceable because they

Plaintiff's First Amended Original Petition
Page 14

Certified Document Number: 62443714

are nonexclusive, not conspicuous, fail of their essential purpose, and/or are unconscionable.

## VI.

### ATTORNEYS' FEES

45.     As a result of the Defendants' breaches of their agreements and other acts and/or omissions as described above, WGMA has been forced to retain counsel and incur reasonable and necessary attorneys' fees.  WGMA seeks to recover its reasonable and necessary attorneys' fees pursuant to TEXAS CIVIL PRACTICES & REMEDIES CODE § 38.001 *et seq.*, and TEXAS BUSINESS AND COMMERCE CODE §§ 17.50(d) and 24.013, as well as conditional awards for any appeals. Additionally, the TSI Agreement and the BMI Agreement (which expressly provides that it "does pertain to affiliates and subsidiaries of [BMI] unless otherwise noted") each provide for an award of attorneys' fees to the prevailing party in an action pertaining to those agreements.

### PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff, WEST GULF MARITIME ASSOCIATION, respectfully prays that it be awarded the following relief:

a)      Judgment against Defendants for a sum within the jurisdictional limits of the Court;

b)      Prejudgment interest at the maximum amount provided by law;

c)      Post judgment interest at the maximum amount allowed by law

d)      Costs of suit; and

e)      Reasonable attorneys' fees.

Plaintiff's First Amended Original Petition
Page 15

Respectfully submitted,

**CARRIGAN, McCLOSKEY & ROBERSON, L.L.P.**


By:___/s/Timothy M. McCloskey_____
      Timothy M. McCloskey
      SBOT:13417650
      Blake E. Rizzo
      SBOT: 24034073
      945 Heights Blvd.
      Houston, Texas 77008
      713-868-5581
      713-868-1275 (fax)
**ATTORNEYS FOR WEST GULF MARITIME ASSOCIATION**

Certified Document Number: 62443714 - Page 16 of 16



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   December 10, 2015

Certified Document Number:        62443714 Total Pages:  16

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

TAB B

10/19/2015 1:10:26 PM
Chris Daniel - District Clerk Harris County
Envelope No. 7432987
By: VERONICA GONZALEZ
Filed: 10/19/2015 1:10:26 PM

CAUSE NO. 2012-58827

| | | |
|---|---|---|
| WEST GULF MARITIME ASSOCIATION INC. | § § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § § | |
| | § | HARRIS COUNTY, TEXAS |
| BUSINESS MICROVAR, INC. D/B/A | § | |
| INTERDYN BMI, PROFESSIONAL | § | |
| ADVANTAGE SOFTWARE SOLUTIONS, | § | |
| INC., AND TECHNOLOGY SUPPORT, INC. | § | 151ST JUDICIAL DISTRICT |

### DEFENDANT PROFESSIONAL ADVANTAGE SOFTWARE SOLUTIONS, INC.'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

Defendant Professional Advantage Software Solutions, Inc. ("PA") files this Motion to Compel Arbitration and Stay Proceedings and respectfully states the following:

### SUMMARY OF MOTION

1. PA seeks to compel Plaintiff, West Gulf Maritime Association Inc. ("WGMA"), to arbitrate the claims asserted against PA in this lawsuit. WGMA's claims are within the scope of a very broad arbitration provision in a Software License Agreement ("SLA"), which is one of three valid, enforceable contracts between WGMA and PA. The SLA provides, in part, that any dispute arising out of or relating to the installation, modification or use of the software provided by PA to WGMA shall be settled by binding arbitration.

2. Each of the asserted claims falls within the scope of the agreement to arbitrate, which is broadly written and encompasses all claims, sounding in contract, tort, or otherwise arising out of or related to PA's involvement on the project. As a result, WGMA's claims should be stayed in this litigation and brought in an arbitration proceeding.

### BACKGROUND

3. The project at issue involves WGMA's replacement and upgrade of its payroll and benefits processing system. This dispute arises out of the design, sale, modification,

implementation, and use of a software package involving all of the defendants. WGMA entered into multiple, separate agreements with each defendant, but has subsequently settled with all of the other defendants, leaving only its claims against PA. WGMA has claimed that PA "breached its contracts with WGMA by failing to design and install a fully functional PAM module that would meet WGMA's specific requirements." *See* Plaintiff's First Amended Petition at ¶33. WGMA also claims PA negligently and intentionally misrepresented material facts for the purpose of inducing WGMA to enter into the contracts with PA. *Id.* At ¶¶37-39. Each of WGMA's other claims arise out of or relate to PA's scope of work on the project.

4.      PA's scope of work on the project was limited to designing a portion of the payroll software package commonly referred to as the Personnel Agency Management module ("PAM Module"), and then implementing the PAM Module for WGMA's use. WGMA contends that there are at least three different contracts between WGMA and PA, including the Functional Design Specifications ("FDS"), Statement of Work ("SOW") and the aforementioned SLA. While neither party executed the SLA after WGMA received it from PA, WGMA concedes that "[PA] did indeed license the software to WGMA . . . and "[t]he License on one hand and the SOW and FDS on the other, were completely separate free standing contracts." *See* Affidavit of Plaintiff WGMA's President and Corporate Representative Nathan Wesley, attached hereto as Exhibit A at ¶21-22. The FDS sets forth the technical specifications for the PAM Module.  The SOW defines the scope of work for the design and implementation of the PAM Module.  And, the SLA ultimately grants WGMA the right to use the PAM Module.  The three agreements are interrelated.

5.      The SLA grants WGMA the right to install the PAM Module software and use it for its internal business operations.  *See* SLA, attached hereto as Exhibit B at ¶1(b), pg. PA0014610-11.  Without the SLA, WGMA has no right to use and evaluate the functionality of the PAM Module.  Pursuant to the SLA, PA warrants, in part, the PAM Module's functionality

shall be free from material defects. *Id.* at ¶3, pg. PA0014612. WGMA now claims that the PAM

Module provided by PA is defective and not fully functional.

6. The SLA contains an arbitration provision as follows:

"10. ARBITRATION AND GOVERNING LAW
(a) <u>Disputes</u>. Any dispute, controversy, cause of action, or claim, of any kind or nature whatsoever, whether legal or equitable, including, but not limited to, claims sounding in contract, torts or products liability and claims based upon alleged violations of consumer protection laws, which arise out of or related to (1) this Agreement, or the breach, termination or invalidity of this Agreement, (2) the sale, installation, modification or use of the [PAM Module], or (3) any services rendered in connection with the sale, installation, modification, or use of the [PAM Module] shall be finally and exclusively settled by arbitration in accordance with the Arbitration Rules of the American Arbitration Association as then in effect by one (1) arbitrator appointed in accordance with such Rules. The place of arbitration shall be Fargo, North Dakota.

\* \* \*

(b) <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the state of North Dakota without regard to the choice of law or conflict of law principles."

*See* SLA, attached hereto as Exhibit B at ¶10, pg. PA0014616.

## ARGUMENT & AUTHORITIES

7. Federal and state policies strongly favor agreements to settle disputes through arbitration. *See, e.g. United Steelworkers of Am. V. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960); *Jack B. Anglin Co. v. Tipps*, 842 S.W.3d 266, 272-73 (Tex. 1992) (orig. proceeding). For this reason, Courts must construe arbitration clauses "as broadly as possible." *S.A. Mineracao da Trindale-Samitri v. Utah Int't, Inc.*, 745 F.2d 190, 194 (2nd Cir. 1984). The United States Supreme Court has held that when there is a dispute as to whether an arbitration clause applies in a given situation,

> [t]here is a presumption of arbitrability in the sense that '*[a]n order to arbitrate* the particular grievance *should not be denied* unless it may be said *with positive assurance* that the arbitration clause *is not susceptible* of an interpretation that covers the asserted dispute. *Doubts should be resolved in favor of coverage.*'

*AT&T Tech., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650 (1986) (quoting *Warrior & Gulf*, 363 U.S. at 582-83) (emphasis added).

8.      If the trial court finds there is a valid agreement to arbitrate, the burden shifts to the party opposing arbitration to prove his affirmative defenses to enforcing arbitration. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003). Once a valid agreement to arbitrate has been established, the court must then determine whether the arbitration agreement covers the nonmovants' claims. *In re First Merit Bank, N.A.*, 52 S.W.3d 749, 753 (Tex. 2001) (orig. proceeding). To determine whether an existing arbitration agreement covers a party's claims, a court must "focus on the complaint's factual allegations rather than the legal causes of action asserted." *Id.* at 754. Federal policy embodied in the FAA favors agreements to arbitrate, and courts must resolve any doubts about an arbitration agreement's scope in favor of arbitration. *Id.* at 753. If the arbitration agreement encompasses the claims and the party opposing arbitration has failed to prove its defenses, the trial court has no discretion but to compel arbitration and stay its own proceedings. *Id.* at 753-54; *D.R. Horton, Inc. v. Brooks*, 207 S.W.3d 862, 866-67 (Tex. App.--Houston [14th Dist.] 2006, no pet.); *Feldman/Matz Interests, L.L.P. v. Settlement Capital Corp.*, 140 S.W.3d 879, 883 (Tex. App.--Houston [14th Dist.] 2004, no pet.).  *Hartford Life Ins. Co. v. Forman*, 2009 Tex. App. LEXIS 3923, *8-9, 2009 WL 1546924 (Tex. App. Corpus Christi June 3, 2009)

9.      North Dakota courts hold likewise: "there is a strong state and federal public policy favoring the arbitration process, and where there is a broad arbitration clause and no exclusion clause, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *See State ex rel. Stenehjem v. Philip Morris, Inc.*, 732 N.W.2d 720 (N.D. 2007)(citing

*Gratech Co., Ltd. v. Wold Eng'g, P.C.,* 672 N.W.2d 672 (N.D. 2003); *State v. Stremick Constr. Co.*, 370 N.W.2d 730, 732 (N.D. 1985)).

**B. WGMA's Claims Are Subject to Arbitration**

10.     WGMA has asserted claims against PA for, among other things, breach of contract, breach of warranties, and negligent/fraudulent inducement.  However, PA's only involvement in this matter related to the PAM Module, which PA provided to WGMA for its use subject to the SLA.  WGMA's claims, just as the three contracts governing the relationship between PA and WGMA, are interrelated and subject to the arbitration provision.

11.     At its most basic, WGMA alleges that PA failed "to design and install a fully functional PAM module." *See* Plaintiff's First Amended Petition at ¶33. The arbitration provision in the SLA specifically includes "**[a]ny dispute**, controversy, **cause of action**, or claim, of any kind or nature whatsoever, whether legal or equitable, including, but not limited to, claims sounding in contract, torts or products liability…**which arise out of or related** to (1) this Agreement, or the breach, termination or invalidity of this Agreement, (2) the sale, **installation, modification or use of the Software**, or (3) **any services rendered in connection with the sale, installation, modification, or use of the Software** shall be finally and exclusively settled by arbitration…."  See Exhibit B at ¶10, pg. PA0014616 (emphasis added).  As a result, each of WGMA's claims are subject to the arbitration provision in the SLA, should be stayed in this present lawsuit, and submitted to arbitration in accordance with the agreement between WGMA and PA.

## PRAYER FOR RELIEF

Defendant Professional Advantage Software Solutions, Inc. files this Motion to Compel Arbitration and Stay Litigation, asking that the claims asserted by Plaintiff be stayed in their

entirety and that the disputes between Plaintiff and Defendant Professional Advantage Software Solutions, Inc. be referred to arbitration; that all costs of Court be taxed against Plaintiff; and that Defendant Professional Advantage Software Solutions, Inc. have such further and other relief, general and special, both at law and in equity, to which Defendant Professional Advantage Software Solutions, Inc. may show itself to be justly entitled.

Respectfully submitted,

**STUBER COOPER VOGE PLLC**

*/s/ Jamey L. Voge*
Jamey L. Voge, SBN 24033424
Brian Cooper, SBN 24012451
2600 Network Blvd., Suite 305
Frisco, Texas  75034
Telephone: (214) 472-2770
Fax:          (214) 472-2790
Email:  jvoge@scvlaw.net
           bcooper@scvlaw.net

ATTORNEYS FOR DEFENDANT PROFESSIONAL ADVANTAGE SOFTWARE SOLUTIONS, INC.

## CERTIFICATE OF CONFERENCE

I certify that I have contacted counsel for Plaintiff and he is opposed to the relief sought in Defendant's Motion to Compel Arbitration and Stay Arbitration Proceedings. Therefore, this matter is presented to the Court for determination.

*/s/ Jamey L. Voge*
Jamey L. Voge

## CERTIFICATE OF SERVICE

I certify that on this 19th day of October, 2015, a true and correct copy of the foregoing has been sent to all parties in accordance with Texas Rule of Civil Procedure 21(a) as follows:

*Via email tmccloskey@cmrllp.com*
*Via email brizzo@cmrllp.com*
Timothy McCloskey
Blake Rizzo
Carrigan, McCloskey & Roberson LLP
945 Heights Blvd
Houston, Texas 77008

*Via email stolson@mcglinchey.com*
Stephanie Tolson
McGlinchey Stafford
1001 McKinney, Suite 1500
Houston, Texas 77002

*Via email smarrs@bmpllp.com*
Scott Marrs
Andrew McGill
Beirne, Maynard & Parsons, LLP
1300 Post Oak Blvd, Suite 2500
Houston, Texas 77056

*Via email ks@lorancethompson.com*
Katherine Sunstrom
Lorance & Thompson, P.C.
2900 North Loop West, Suite 500
Houston, Texas 77092

/s/ Jamey L. Voge

# EXHIBIT A

| | | |
|---|---|---|
| WEST GULF MARITIME ASSOCIATION<br>Plaintiff, | § § § § | IN THE DISTRICT COURT |
| VS. | § § | HARRIS COUNTY, TEXAS |
| BUSINESS MICROVAR, INC. D/B/A INTERDYN BMI, PROFESSIONAL ADVANTAGE, AND TECHNOLOGY SUPPORT INCORPORATED<br>Defendants. | § § § § § § | 151ST JUDICIAL DISTRICT |

## AFFIDAVIT OF NATHAN WESELY

BEFORE ME, the undersigned notary, on this day personally appeared Nathan Wesely, a person whose identity is known to me. After I administered an oath to him, upon his oath, he said:

1. "My name is Nathan Wesely. I am over the age of 18, of sound mind, capable of making this Affidavit, and fully competent to testify to the matters stated in this Affidavit. I have never been convicted of a felony or a crime of moral turpitude.

2. I am the President and Corporate Representative of the West Gulf Maritime Association ("WGMA"), the plaintiff in this lawsuit. I have personal knowledge of the facts stated in this Affidavit and am able to provide this Affidavit. The facts stated are true and correct.

3. WGMA is in the business of negotiating and administering multiemployer collective bargaining agreements on behalf of stevedores that employ ILA labor in the ports from Brownsville, Texas, to Lake Charles, Louisiana. Administration of the collective bargaining agreements includes facilitating the adjudication of grievances under the grievance and arbitration procedure, training workers, and processing payroll. In addition, WGMA provides payroll, human resource and benefit services to a variety of businesses, including providing assistance and advice

Page 1



EXHIBIT
B

on day to day personnel issues. WGMA's payroll system is quite complex, because it requires WGMA to process payroll for thousands of longshore workers who may potentially work for several different companies who employ labor under the collective bargaining agreement.

4. Originally, WGMA ran its payroll and benefits processing through an IBM AS400 system. The AS400 was an antiquated system that was developed by an employee of WGMA. The AS400 system used proprietary software in a programming language that has fallen out our favor and few software programmers know or use this language. In 2010, WGMA decided to upgrade its system to keep up to date with current technology and provide a more streamlined and efficient payroll and benefits processing system.

5. In 2010, WGMA began interviewing software companies to design and or implement and configure a software program to upgrade WGMA's financial accounting, reporting and payroll processing. WGMA interviewed approximately three or four different companies. Ultimately, WGMA agreed to enter into contracts with BMI, ProFad and TSI to implement Microsoft Dynamics Great Plains ("GP") and Personnel Agency Management ("PAM") for WGMA's financial accounting, reporting, payroll processing, and related applications (the "System").

6. As the President of WGMA, I was significantly involved with all aspects of the implementation of the System at issue in this lawsuit. I was involved in the process from the beginning when WGMA interviewed different software companies, I negotiated and signed the various contracts at issue, I was the recipient of representations from the Defendants, I participated in a number of weekly meetings during the implementation of the System and I routinely and regularly communicated with the project manager and WGMA employees regarding the

implementation. I am an expert in the payroll processing system WGMA used, including the system's infrastructure and functional requirements.

7. Prior to signing its contract with WGMA, ProFad was given unbridled access to the user and executive teams at WGMA in order to facilitate ProFad's due diligence. ProFad was also given access to third-party payroll personnel that depended on WGMA. ProFad spent approximately two weeks conducting due diligence in order to understand the specific functional requirements of WGMA.

8. During the course of its investigation and negotiation with WGMA, ProFad made specific representations to WGMA that induced WGMA to enter into the contracts with ProFad. ProFad engaged in frequent telephone and face-to-face discussions in which it aggressively touted its abilities and experiences with similarly situated companies like WGMA. ProFad represented that it had PAM software that could accomplish WGMA's goals without the need for extensive modification. ProFad represented that it had installed this particular system on several occasions and thus, there would be no need to re-invent the wheel with customized software for WGMA. Moreover, ProFad assured WGMA that if it retained ProFad, WGMA would be able to save the cost of customization by utilizing the PAM software, software that ProFad claimed would meet all of WGMA's functional business requirements with minimal modification, including running with the same functionality as the AS400. Based on ProFad's alleged expertise in the industry, and their continual representations regarding ProFad's and PAM's capabilities, WGMA agreed to have ProFad work on the project.

9. During the negotiation process, ProFad extolled to WGMA the virtues of the PAM software, the number of successful implementations that ProFad had completed, the installation

lead time, and ProFad's own capabilities. This information was provided to WGMA to induce and influence WGMA in its decision to hire ProFad and proceed with the PAM application. In reliance upon ProFad's claimed expertise and many specific promises and assurances that PAM would meet WGMA's needs, including but not limited to the fact that the new System would run with the same functionality as the AS400, and upon ProFad conducting what they claimed was the necessary due diligence, WGMA entered into a contract with ProFad to implement the System.

10. Not once during the meetings and telephone conversations between ProFad and WGMA, however, did ProFad notify WGMA that the software was unsuitable for WGMA's business, that it could not be installed in a reasonably functioning form, that it would not meet the AS400's functionality, and that it would require extensive modification and several months of installation lead time. It was only after WGMA's internal investigation into the process of installing GP in December 2010 that WGMA discovered that GP may not be a stable platform, that GP may not be capable of processing the payroll run by WGMA because of architectural limitations inherent in GP, and that extensive modification to PAM would be necessary to meet WGMA's payroll needs.

11. ProFad's due diligence, as it turned out, was woefully inadequate, and resulted in delays in the implementation of the system. After reviewing the original Statement of Work ("SOW") and Functional Design Specifications ("FDS") ProFad submitted, WGMA determined that ProFad did not understand WGMA's business and functional requirements. In order to assist BMI and ProFad with further due diligence, WGMA agreed to provide BMI and ProFad with a requirements/activities list to help both BMI and ProFad understand the functional requirements of WGMA. All parties agreed that the requirements/activities list would be beneficial in assisting

BMI and ProFad with their due diligence. Despite the requirements/activities list and unfettered access to WGMA, ProFad's SOW and FDS were still incomplete on the day of the anticipated contract signing. WGMA personnel spent an additional couple of days with ProFad's due diligence team working on extensive revisions to ProFad's FDS. At no time during the due diligence process, did ProFad advise WGMA that PAM would need extensive modifications. In fact, ProFad repeatedly represented that minimal modifications would be needed, which was one of things that made their proposal attractive to WGMA. After ProFad's due diligence was complete, WGMA finally signed the SOW on November 5, 2010.

12.    On or about October 4, 2012, WGMA entered into an agreement with BMI (the "Agreement"). Consistent with the representations made by BMI and ProFad, the Agreement stated that the System would "(a) run a payroll system with at least the same functionality as ["WGMA's] current system," (b) maintain worker records in the payroll system with at least the level of detail as [WGMA's] current system," and (c) run accounting programs for [WGMA] and its affiliated entities and benefit programs." *Id.* The Agreement also stated that "[t]he accounting systems will be installed and functional by October 31, 2010," and "[t]he payroll system will be live on December 23, 2010." *Id.* BMI represented that the total cost for the System, including any additional vendors that might be necessary, would be approximately $600,000. The Agreement was modified on November 5, 2010 to change the "go live" date from December 23, 2010 to February 18, 2011.

13.    When ProFad finally implemented the System, the System was a total failure. The failure was due primarily to ProFad's failure to accurately define WGMA's necessary business and functional requirements, and to provide the resources needed for the System to work.

14. ProFad grossly misrepresented the capabilities of its PAM application, failed to define the limits of its PAM application, and was unable to meet WGMA's requirements for a fully operational system with the same functionality as the AS400. During the entire process, and continuing to the present, ProFad has been unable to provide WGMA with correct overtime calculations and reporting. From the beginning of this project, the PAM application was unable to process overtime ("OT") calculations in accordance with WGMA's requirements. ProFad was aware of PAM's inability to calculate OT. Even though the System should have been able to calculate overtime by the original deadline of December 2010, in April 2011, ProFad began developing a custom PAM application to calculate OT in accordance with WGMA's requirements. The custom OT application was in testing since June 2011 to the end of the project. PAM's failure to properly calculate OT was a continuous issue throughout the project that was discussed with WGMA and ProFad personnel on a weekly basis. PAM was subjected to testing on a regular basis and ProFad, throughout the term of the project, was unable to ever determine a solution for PAM's failure to properly calculate OT. Rather, each week ProFad would simply say "we're working on it."

15. Upon WGMA's attempts to go-live on October 3, 2011, it was confirmed by WGMA and ProFad that the OT calculations were still incorrect.

16. Although the system went live on January 3, 2012, the PAM application provided by ProFad did not go completely live on January 3, 2012, because the OT issue had not been resolved by ProFad by the go-live date. Rather, in order to calculate OT, WGMA was forced to calculate OT using the old AS400 system and continued to approve the OT using the old AS400 system. In fact, WGMA still uses this duplicative method for calculating OT today due to ProFad's

inability to meet WGMA's functional requirements and the failure of the PAM application.

17. In the end, WGMA, at its own cost, has had to add additional software or custom programming which was not originally specified in the budget, and in some cases has had to hire additional experts to resolve functionality issues such as system configuration, document management, timesheet processing, worker garnishments, and negative pay. As a result, WGMA incurred additional significant delays and cost overruns.

18. In addition, WGMA had to hire temporary workers and independent consultants to assist regular personnel with manual data entry and to process payroll transactions that were not supported by the System as configured. The hiring of additional personnel was necessary for WGMA to operate its business without impacting its customers.

19. WGMA incurred the following expenses in connection with the implementation of the System:

| | |
|---|---|
| $176,139.42 | Ignite Media (Hired to Replace PAM software) |
| $945,982.67 | Payments to BMI and ProFad (Estimated to be $600,000) |
| $75,570.00 | Dave Kesian (Additional Personnel) |
| $304,456.53 | Sirius Solutions (Project Management) |
| $333,127.93 | Tatum (Project Management) |
| $228,804.00 | Technisource, Inc. (Additional Personnel) |
| $123,000.00 | Additional Personnel for Marine Terminal and AS400 |
| $46,843.06 | Payments to Technology Support |
| $66,033.77 | Tribridge Holdings (Replaced Technology Support) |

$2,299,957.38 Total

20. At a minimum, not including tort damages and any other available remedies under the UCC, WGMA has incurred the following hard expenses attributable to ProFad in connection with the implementation of the System:

| | |
|---|---|
| $176,139.42 | Ignite Media (Hired to Replace PAM software) |
| $207,281.65 | Payments to ProFad |

$75,570.00   Dave Kesian (Additional Personnel)
$481,434.70   Sirius Solutions and Tatum (Project Management)
$123,000.00   Additional Personnel for Marine Terminal and AS400

$1,063,425.77 Total

21.    As a result, WGMA has sued ProFad on the Agreement, the SOW and the FDS. In its First Amended Original Petition WGMA has asserted claims against ProFad for breach of contract claim, negligent and fraudulent misrepresentations and express and implied warranties claims. WGMA is not suing ProFad under the unsigned License. Profad did indeed license the software to WGMA, the problem is the software does not work or comply with the FDS or SOW.

22.    The SOW and FDS dealt with the scope of work involved in the customization and implementation of the PAM module along with the timeline for implementation and the parties' responsibilities. The License, on the other hand, simply dealt with licensing of the PAM software and quite frankly was so unimportant to the transaction at issue, was not signed by either party. The License on one hand and the SOW and FDS on the other, were completely separate free standing contracts.

23.    I am the custodian of records for WGMA. All of the exhibits referenced below that are attached to the summary judgment response are true and correct copies of records that are kept by WGMA in the ordinary course of business or produced by the other Defendants during litigation. It was in the regular course of business for an employee or representative of WGMA who had knowledge of the act, event, condition, or opinion recorded, to transmit information to be included in such record. The record was made at or near the time the act, event, condition, or opinion recorded or reasonably soon thereafter. The exhibits are exact duplicates of the originals.

Page 8

| Exhibit A | First Amended Original Petition |
|-----------|-------------------------------|
| Exhibit C | Statement of Work |
| Exhibit D | Functional Design Specification |
| Exhibit E | Software License Agreement |

FURTHER AFFIANT SAYETH NOT."

[Signature Page Follows]

_____
Nathan Wesely

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, on this 9th day of September, 2015.

My Commission Expires:

*2-22-2017*

Signature of Notary Public

*Barbara Clements*

Printed Name of Notary Public

# EXHIBIT B

**From:** Craig Erickstad
**Sent:** Thursday, November 11, 2010 7:48 AM
**To:** Hall, Derek; Daphne Bernicker
**Subject:** WGMA - PAM software license agreement.
**Attachments:** PAM License Agreement_revised03_2007.pdf

Derek, Daphne

Attached is the PAM software license agreement. Please review and return a the signed document. This will need to be signed by December 8th.

Let me know if you have any questions.

**Craig Erickstad**



*Microsoft Dynamics Fits Your Staffing Company - Your System Your Way*
## 1Staff and Personnel Agency Management (PAM) Module

Professional Advantage
Phone: (701) 235 2363 Ext 203
Web: www.dynamicsstaffing.com

**Personnel Agency Management - Staffing Solution**Business Intelligence**National Accounts**Company Data Archive**Retail Solutions**

icrosoft Inner Circle Partner 1999 - 2008


EXHIBIT
A-1


EXHIBIT
14
Wesley

1

PA0014609



## Software License Agreement
## Personnel Agency Management (PAM)

**DO NOT ALTER OR AMEND THIS AGREEMENT IN ANY MANNER WITHOUT THE CONSENT OF PROFESSIONAL ADVANTAGE. ANY ALTERATIONS OR AMENDMENTS WITHOUT SUCH CONSENT WILL VOID THIS AGREEMENT AND YOUR LICENSE TO USE THE SOFTWARE.**

This Agreement is entered into by and between Professional Advantage, Inc. ("PA") and the undersigned licensee ("Licensee") and shall be effective as of the date set forth below. This agreement covers the PAM Core Module and other products associated with and/or utilizing this module, including: Webhouse, Web Based Timesheets, and Timesheet entry and Imaging.

1. LICENSES
    (a) <u>Definitions</u>.
        (i) "Software" means the core module of the Personnel Agency Module (PAM) software product, as marked, including enhancements delivered by PA during such period Licensee remains a member of the PA Enhancement Program:

        (ii) "Documentation" means any user and technical documentation for the Software in electronic or printed format that is delivered to Licensee with the Software.

    (b) <u>Grant of License</u>. PA grants Licensee the non-exclusive and non-transferable right to:
        (i) copy the server portion of the Software onto a Designated Server or in a "Cluster" which includes the Designated Server Computer. A "Cluster" shall mean two or more server computers which are interconnected. Use in a Cluster is only permitted if no module of the Software is active on more than one server computer at any given time. Licensee shall notify PA in advance in the event that it intends to relocate or change the Designated Server Computer. Licensee may maintain a separate non-productive

PA0014610

disaster recovery and testing site provided that the installation is used solely for the purposes of backup and emergency use. Licensee may not have more than one active installation of the Software on the Designated Server Computer or a Cluster unless Licensee purchases additional Software licenses;

    (ii)  copy the client portion of the Software onto an unlimited number of computers provided that all software so installed references a single database on the Designated Server Computer.

    (iii)  execute and use the Software for Licensee's internal business operations; and

    (iv)  use the associated Documentation and make a reasonable number of copies or printouts thereof for Licensee's internal use.

    (v)  Licensee's license to use the Software is perpetual.

(c) <u>Database Software</u>. Licensee is required to license the appropriate database software, including the appropriate number of user licenses, from the corresponding third party provider.

(d) <u>Sublicensing/Transfer</u>. Licensee shall not grant sublicenses, rent, transfer copies of or otherwise assign the Software or Documentation or the right to use the same to benefit any third party. Any attempt to grant sublicenses, transfer any rights, rent or otherwise assign or deal in the Software or Documentation shall be considered a breach of this Agreement by Licensee.

(e) <u>Backup Copy</u>. Licensee may make a reasonable number of backup copies of the Software which shall also be subject to the terms and conditions of this Agreement. Licensee must maintain an accurate record of the location of such backup copies at all times. Such record may be inspected and verified by PA at any time during Licensee's business hours upon notice by PA. Licensee acknowledges the need to maintain regular back-up copies and to adopt other such management procedures to avoid the consequence of loss of data in the event of any equipment or software malfunction.

(f) <u>Restrictions on Use</u>. Licensee may use the Software and Documentation only in the conduct of its internal business operations and those of a Company as defined in this Section. "Company" shall mean a business entity which is "Controlled" by or under common "Control" with Licensee. "Control" of any entity for the purposes of this section means ownership of at least 50% of the shares of an entity or entitlement to elect a controlling interest of the board of directors of such entity or other management relationship sufficient to control the entity's business policies and activities. The Software may not be used directly or indirectly for any entity that is not a Company and may not be used to operate a service bureau or provide hosting, outsourcing or subscription services. Any unauthorized use of the Software will automatically void this license and subject Licensee and others to legal claims by PA for copyright infringement and unauthorized use, including claims for injunctive relief and monetary damages.

2. PROPRIETARY RIGHTS

(a) <u>Ownership</u>. All title and rights of ownership in the Software and Documentation remain with PA and/or its suppliers or licensors and are protected by applicable copyright, patent, trademark and trade secret laws. Licensee agrees to take any

PA0014611

reasonable step necessary to protect the proprietary rights of PA and its suppliers or licensors in the Software and Documentation, including, but not limited to, the proper display of copyright, trademark, trade secret and other proprietary notices on any copies of the Software or Documentation. Licensee must keep the Software free and clear of any claims or liens by third parties. All rights and licenses granted under or pursuant to this Agreement are and shall otherwise be deemed to be, for purposes of Section 365(n) of the U.S. Bankruptcy Code, licenses of rights to "intellectual property" as defined under section 101(56) of the U.S. Bankruptcy Code.

(b) <u>Decompilation</u>. Licensee shall not disassemble, decompile or otherwise reverse engineer the Software except and only to the extent that such activity is expressly permitted by applicable law.

## 3. WARRANTIES, EXCLUSIONS AND LIMITATIONS

(a) <u>Warranties</u>.

(i) Product Warranty. PA warrants that, for a period of sixty (60) days from the date the Software is delivered to Licensee, the Software's functionality and performance shall be free of material defects and shall substantially conform to the Documentation, provided that it is properly used with the operating system for which it was designed.

(ii) Media Warranty. PA warrants that the Software will be properly copied onto diskettes or other media and that the diskettes and media will be free from defects in materials and workmanship under normal use and services for a period of sixty (60) days from the date the Software is delivered to Licensee.

(iii) Title Warranty. PA warrants that it is the owner or authorized licensee of the Software or has the rights to license the Software to Licensee under the terms of this Agreement.

(b) <u>Limitations</u>.

(i) PA does not warrant that the functions contained in the Software will meet Licensee's requirements or that the operation of the Software will be uninterrupted.

(ii) In order to receive and maintain the above warranties, Licensee must (i) use the Software in accordance with the Documentation; (ii) use the Software on the hardware and with the operating system for which it was designed and in accordance with operating requirements and procedures for such hardware and operating systems; and (iii) allow only personnel trained on the Software to operate the Software.

(iii) The above warranties are null and void if Licensee or any third party modifies or changes the Software in any way beyond the scope of the customization options contained in the Software, or otherwise than in accordance with the requirements or procedures for such customization, or if failure of the Software has resulted from accident, abuse or misapplication. The warranties do not apply to errors or malfunctions caused by (i) machine malfunction; (ii) equipment or software not licensed in this Agreement; (iii) use of procedures or data by Licensee not in accordance with the

PA0014612

Documentation; or (iv) any other cause not attributable to PA or the software.

    (iv) Licensee acknowledges that PA is not required to maintain compatibility between the Software and software not specified in this Agreement, including, but not limited to, versions of Software other than those listed in this Agreement.

    (v) PA will provide support for the current major version of the software and the major version prior as part of software maintenance and the enhancement plan. Any support provided for earlier versions will be included as part of a maintenance contract as the sole discretion of PA or it will be done on a consulting basis.

(c) Duty to Inform. If Licensee believes that the Software is not substantially performing in accordance with the Documentation, Licensee will promptly notify PA in writing regarding any such non-performance and will provide a listing of output and such other data as may be required by PA to reproduce operating conditions as existed when the non-performance occurred.

(d) DISCLAIMER OF WARRANTY

    (i) EXCEPT AS STATED ABOVE, PA MAKES NO OTHER WARRANTIES REGARDING THE SOFTWARE OR DOCUMENTATION, INCLUDING, WITHOUT LIMITATION, EXPRESS OR IMPLIED WARRANTIES, AND EXPRESSLY DISCLAIMS THE WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE OR MERCHANTABILITY, AND ANY OTHER WARRANTY, EXPRESS OR IMPLIED.

    (ii) Any statements made by a dealer or any other third party other than PA are not warranties and cannot be relied on by Licensee.

    (iii) PA shall not be liable for any claimed non-conformance of the Software under Article 35(2) of the United Nations Convention on Contracts for the International Sale of Goods, even if that Convention were to be determined applicable to this Agreement and the underlying transactions.

(e) LIMITATION OF LIABILITY

    (i) IN NO EVENT SHALL PA OR ANYONE ELSE WHO HAS BEEN INVOLVED IN THE CREATION, PRODUCTION OR DELIVERY OF THE SOFTWARE OR THE DOCUMENTATION BE LIABLE FOR ANY INCIDENTAL, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES, LOSS OF BUSINESS, LOSS OF PROFITS, LOSS OF GOODWILL OR TORTIOUS CONDUCT HOWEVER CAUSED (INCLUDING NEGLIGENCE) RELATING TO, CAUSED BY OR ARISING OUT OF ANY BREACH OF OBLIGATIONS OR DELAY IN DELIVERY OF SOFTWARE OR DOCUMENTATION UNDER THIS AGREEMENT OR FROM LICENSEE'S USE OR INABILITY TO USE THE SOFTWARE, EVEN IF PA HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGES.

    (ii) SOME STATES OR JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR

PA0014613

CONSEQUENTIAL OR INCIDENTAL DAMAGES SO THE ABOVE LIMITATION MAY NOT APPLY TO LICENSEE IN SUCH JURISDICTIONS.

(iii) EXCEPT FOR ANY LIABILITY WHICH MAY ARISE UNDER SECTION 5, ANY DAMAGES THAT PA IS REQUIRED TO PAY FOR ANY AND ALL CAUSES, WHETHER FOR NEGLIGENCE, BREACH OF CONTRACT OR OTHERWISE, REGARDLESS OF THE FORM OF ACTION, SHALL, IN THE AGGREGATE, BE LIMITED TO THE PRICE PAID BY LICENSEE TO PA FOR THE SOFTWARE.

4. REMEDIES

Licensee's exclusive remedy relative to a breach of the warranties provided in Section 3(a) hereof shall be for PA, at its option to either:

(a) replace the Software that does not meet the limited warranty described above and that is returned to PA on the original distribution media; or

(b) attempt to correct any errors which Licensee finds in the Software during the warranty period and which prevent the Software from substantially performing as described in the Documentation; or

(c) In the event PA determines that the remedies under subsections a) and b) above are impracticable during the warranty period, PA shall refund to Licensee the Software license fees (and no other fees) paid by Licensee. Any replacement Software will be warranted for a period of thirty (30) days from the date such replacement Software is delivered to Licensee.

5. INTELLECTUAL PROPERTY INFRINGEMENT/INDEMNIFICATION

PA shall defend, indemnify and hold harmless Licensee, its employees, officers and directors, at PA' sole cost and expense, for any demand, claim, suit or proceeding brought against Licensee which alleges that the Software, as delivered and used in accordance with the terms of this Agreement, infringes any third party patent, copyright or other intellectual property right, and to pay the amount of any judgment or settlement, provided that Licensee gives PA prompt written notice of such claim, suit or proceeding and gives PA full information and reasonable assistance in its defense or settlement. PA shall be entitled to direct such defense and to settle or otherwise dispose of such claim, suit or proceeding as it sees fit. If an injunction is obtained in such action against Licensee's use of the Software, PA shall, at its option and expense, either (1) obtain for Licensee the right to continue to use the Software; or (2) replace the Software with a product with substantially equivalent functionality; or (3) modify the Software so that it becomes non-infringing, while maintaining substantially equivalent functionality; or, if (1), (2) or (3) above are not practical, terminate this Agreement and reimburse Licensee for the Software license fees actually paid by Licensee to PA. The reasonable costs of Licensee's cooperation with PA at PA's request, in accordance with this Section, shall be paid by PA and shall include the reasonable costs of Licensee's initial consultation with its attorney. No other costs or expenses shall be incurred for the account of PA without PA's prior written consent. Licensee may participate with PA in Licensee's own defense in such

PA0014614

claim, suit or proceeding, at Licensee's option and at Licensee's sole expense.

Licensee agrees to defend and hold harmless PA and its officers and employees against any loss, cost or expenses incurred as a result of a claim of infringement based on modifications to the Software made by or for Licensee without PA's prior written approval.

## 6. ENHANCEMENT PROGRAM

Licensee has also purchased a one-year subscription to the PA Enhancement Program commencing on the date the software was invoiced. Under this program, PA will provide to Licensee, at no additional charge, all updates, upgrades, refinements and added features to the Software, which are commercially released by PA during the subscription period. Enhancement plans for any future years, if made available by PA and purchased by Licensee, are based on the then current PA list price for the Software.

## 7. NO AGENCY OR PARTNERSHIP RELATIONSHIP

(a) Independent Reseller. Licensee recognizes and acknowledges that any distributor or authorized reseller of PA, through which Licensee has licensed the Software or obtained services related to the Software, is not the agent or the partner of PA. Any such distributor or authorized reseller is an independent company, person, or entity with no authority to bind PA or to make representations or warranties on behalf of PA. In this regard, PA makes no representation or warranties regarding its software except as expressly set forth in this Agreement.

(b) Invoicing and Payment. PA acknowledges and agrees that if the license for the software is purchased from an independent third party vendor then Licensee, upon full payment of the license fees to such vendor, will owe no license fees to PA.

## 8. ENTIRE AGREEMENT

This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all previous proposals, oral or written, express or implied, and all negotiations, conversations or discussions heretofore had between the parties hereto related to the subject matter of this Agreement. To the extent that the terms and conditions of this Agreement conflict with any other written or oral statements or representations made by PA including, but not limited to, any statements and representations set forth in the License Agreement contained in shrink-wrapped packages of the Software or in electronic on-line license agreements, the terms and provisions of this Agreement shall be controlling.

## 9. TERM AND TERMINATION

(a) Term. The licenses granted under this Agreement shall commence on the date set forth below and shall continue in effect perpetually unless terminated in accordance with Section 9(b) below.

(b) Termination. Either party may immediately terminate this Agreement if the other party breaches any material representation, warranty, obligation or provision of this Agreement and does not cure such breach within thirty (30) days after receipt

PA0014615

of written notification fro the non-breaching party of such breach. Upon such termination, Licensee, at the option of PA, shall either promptly return to PA all copies of the Software and Documentation in Licensee's possession or destroy all such copies within a reasonable transition period not to exceed thirty (30) days after the effective date of such termination, and shall certify in writing that all such copies have been destroyed. PA has the right to inspect and audit Licensee's computers to ensure compliance with the preceding requirement.

(c) Other Obligations. Termination of this Agreement does not affect or terminate any agreement of commitments Licensee may have with other entities, including, but not limited to, application service providers or leasing companies.

10. ARBITRATION AND GOVERNING LAW
(a) Disputes. Any dispute, controversy, cause of action, or claim, of any kind or nature whatsoever, whether legal or equitable, including, but not limited to, claims sounding in contract, torts or products liability and claims based upon alleged violations of consumer protection laws, which arise out of or relate to (1) this Agreement, or the breach, termination or invalidity of this Agreement, (2) the sale, installation, modification or use of the Software, or (3) any services rendered in connection with the sale, installation, modification or use of the Software shall be finally and exclusively settled by arbitration in accordance with the Arbitration Rules of the American Arbitration Association as then in effect by one (1) arbitrator appointed in accordance with such Rules. The place of arbitration shall be Fargo, North Dakota. Judgment upon the award of the arbitrators may be entered in any court having jurisdiction thereof.

(b) Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of North Dakota without regard to the choice of law or conflict of law principles. The United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

11. GENERAL TERMS AND CONDITIONS
(a) Listing. Licensee agrees to be listed (by name only) in PA's public customer list.

(b) Assignment. Licensee shall not assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of PA. Consent shall not be unreasonably withheld provided, however, that no consent shall be required for any assignment or transfer to a "Company" as defined in Section 1(f) herefor in the event of an initial public offering, merger, acquisition, consolidation, sale of all or substantially all of Licensee's assets or stock except that Licensee shall notify PA in writing prior to such assignment or transfer. This Agreement shall inure to the benefit of and shall be binding on the successors of the parties. This Agreement and the rights and obligation arising hereunder shall not be affected by any change in the corporate structure or ownership of the parties except where Licensee goes into liquidation, or becomes subject to administration or is voluntarily or involuntarily wound up, in which case this Agreement and by a receiver Licensee's rights and obligations arising hereunder shall automatically terminate.

(c) Export Controls. Licensee agrees that no technical data received from PA, nor

PA0014616

the direct product thereof, will be shipped, transferred or exported, directly or indirectly, to any country in violation of any applicable law, including the United States Export Administration Act and the regulations there under.

(d) _Amendment_. This Agreement shall not be deemed or construed to be modified, amended, rescinded, canceled or waived, in whole or in part, except in a writing signed by both parties hereto.

(e) _Severability_. In the event that any or any part of the terms of this Agreement are in conflict with any rule of law or statutory provision or are otherwise void, unenforceable or illegal under the laws or regulations of any government or subdivision thereof, such terms or parts thereof shall be deemed stricken from this Agreement, but such invalidity, unenforceability or illegality shall not invalidate any of the other terms of this Agreement, and this Agreement shall continue in force, unless the invalidity, unenforceability or illegality of any such provisions hereof does substantial violence to, or where the invalid, unenforceable or illegal provisions comprise an integral part of, or are otherwise inseparable from, the remainder of this Agreement. The validity or enforceability of that provision or relevant part in any other jurisdiction is not affected.

(f) _Waiver_. No failure by either party hereto to take any action or assert any right hereunder shall be deemed to be a waiver of such right in the event of the continuation or repetition of the circumstances giving rise to such right.

(g) _Language of Agreement_. The parties declare that they have required that this agreement and all documents related hereto, either present or future, be drawn up in the English language only. *Les parties déclarent par les présentes qu'elles exigent que cette entente et tous les documents y afférents, soit pour le présent ou le futur, soient rédigés en langue anglaise seulement.*

PA0014617

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the last date indicated below.

PROFESSIONAL ADVANTAGE, INC. _____
(Licensee)

By: _____  By: _____

Title: _____  Title: _____

Date: _____

Licensee's Place of Business:

_____

_____

Tel: _____

FAX: _____

PA0014618

# TAB C

11/17/2015 11:30:06 AM
Chris Daniel - District Clerk
Harris County
Envelope No: 7861370
By: GONZALEZ, VERONICA
Filed: 11/17/2015 9:59:27 AM

CAUSE NO. 2012-58827

| | | |
|---|---|---|
| WEST GULF MARITIME ASSOCIATION INC. | § § § | IN THE DISTRICT COURT OF |
| VS. | § § | |
| | § | HARRIS COUNTY, TEXAS |
| BUSINESS MICROVAR, INC. D/B/A INTERDYN BMI, PROFESSIONAL ADVANTAGE SOFTWARE SOLUTIONS, INC., AND TECHNOLOGY SUPPORT, INC. | § § § § | 151ST JUDICIAL DISTRICT |

## ORDER ON DEFENDANT'S MOTION TO COMPEL ARBITRATION & STAY PROCEEDINGS

On this day the Court considered Defendant Professional Advantage Software Solutions, Inc.'s Motion to Compel Arbitration and Stay Proceedings. After considering the motion, evidence and arguments of counsel, the Court

_____xx_____  DENIES the Motion., on the basis of waiver by Defendant Professional Advantage Software Solutions, Inc. **

~~GRANTS the Motion and orders the parties to arbitrate the disputes as set forth in the arbitration provisions applicable to this matter. The court stays the proceedings pending the outcome of the arbitration.~~

SIGNED on this _____ day of _____, 2015.

Signed: [signature]
11/18/2015

_____
JUDGE PRESIDING

** The Court is not certain that findings of fact and conclusions of law are appropriate in this instance. If non-movant would like the Court to make them, it should file a short brief in support of the necessity for them, and file proposed findings and conclusions for the Court to sign.

# TAB D

11/24/2015 5:25:53 PM
Chris Daniel - District Clerk
Harris County
Envelope No: 7981952
By: RODRIGUEZ, JIMMY E
Filed: 11/24/2015 5:25:53 PM

Pgs-1

STPRY

CAUSE NO. 2012-58827

| | | |
|---|---|---|
| WEST GULF MARITIME ASSOCIATION INC. | § § § | IN THE DISTRICT COURT OF |
| VS. | § § § | |
| | § | HARRIS COUNTY, TEXAS |
| BUSINESS MICROVAR, INC. D/B/A INTERDYN BMI, PROFESSIONAL ADVANTAGE SOFTWARE SOLUTIONS, INC., AND TECHNOLOGY SUPPORT, INC. | § § § § | 151ST JUDICIAL DISTRICT |

## ORDER ON DEFENDANT'S MOTION TO STAY THE PROCEEDINGS

On this day the Court considered Defendant Professional Advantage Software Solutions, Inc.'s Motion to Stay the Proceedings ("Motion"). After considering the Motion, evidence and arguments of counsel, the Court; hereby

DENIES ~~GRANTS~~ the Motion;

~~and the Court **STAYS** all proceedings and remove the trial, which is currently set on January 18, 2016, from the Court's docket during the pendency of Defendant Professional Advantage Software Solutions, Inc.'s interlocutory appeal challenging the Court's November 18, 2015 denial of Defendant Professional Advantage Software Solutions, Inc.'s Motion to Compel Arbitration and Stay Proceedings.~~

SIGNED on this _____ day of _____, 2015.

Signed: *[signature]*
12/8/2015

_____
JUDGE PRESIDING

Certified Document Number: 68146276 - Page 1 of 1



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   December 10, 2015

Certified Document Number:        68146276 Total Pages:  1

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

# TAB E

CAUSE NO. 2012-58827

| | | |
|---|---|---|
| WEST GULF MARITIME ASSOCIATION | ' | IN THE DISTRICT COURT |
| | ' | |
| VS. | ' | |
| | ' | |
| BUSINESS MICROVAR, INC. D/B/A | ' | OF HARRIS COUNTY, T E X A S |
| INTERDYN BMI, PROFESSIONAL | ' | |
| ADVANTAGE, and TECHNOLOGY | ' | |
| SUPPORT, INCORPORATED | ' | 151st JUDICIAL DISTRICT |

**PLAINTIFF'S RESPONSE TO PROFESSIONAL ADVANTAGE
SOFTWARE SOLUTIONS, INC.'S MOTION TO STAY PROCEEDINGS**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff WEST GULF MARITIME ASSOCIATION ("WGMA") files this Response to the Motion to Stay Proceedings (the "Motion") filed by Defendant PROFESSIONAL ADVANTAGE SOFTWARE SOLUTIONS, INC. ("ProFad"), and in support thereof, respectfully states as follows:

1.      WGMA invoked this Court's jurisdiction over three years ago by filing the underlying lawsuit.  Defendant filed its counterclaim for breach of contract and declaratory judgment over a year ago.  Now, despite five prior trial settings, ProFad, and its new counsel,  ask the Court to stay the proceedings while ProFad appeals this Court's denial of ProFad's motion to compel arbitration.  Because the Court has already found that ProFad waived its right to arbitrate, this Motion should be denied and the case should proceed to trial on January 19, 2016.

2.      Pursuant to TEX. CIV. PRAC. & REM. CODE ANN. § 171.0259(a), the Court shall stay a proceeding *only* if an order for arbitration was made.  In this case, no such order was made and a stay is not warranted. The decision to stay the proceedings is left to the court's discretion. *See Williamson v. Tucker*, 615 S.W.2d 881 (Tex. Civ. App.—Dallas 1981, writ ref'd n.r.e.) (stating

that "[a] motion to stay a state court proceeding is a matter directed to the discretion of the [trial] court.").

3. In order to prevail on appeal, ProFad will have to show that there was no evidence to support this Court's ruling and that this Court abused its discretion. *See Pepe Int'l Dev. Co. v. Pub Brewing Co.*, 915 S.W.2d 925, 929 (Tex. App.  Houston [1st Dist.] 1996, no writ) ("In an appeal from an interlocutory order denying a motion to compel arbitration, the applicable standard of review is that of 'no evidence.' Under the 'no evidence' standard, the appellate court considers only the evidence and inferences tending to support the finding under attack and disregards all evidence and inferences to the contrary.")  Like the trial court in *Pepe Int'l Dev. Co.*, this Court did not enter findings of fact and conclusions of law[1], thus the appellate  court must affirm the trial court's order if  "there is sufficient evidence to support it upon any legal theory asserted." *Id*. Here, the record is replete with evidence supporting this Court's ruling and the likelihood of ProFad's success on appeal is slim.

4. The Court has already determined that ProFad waived its right to arbitrate and the reasons were articulated to the parties at the hearing.  This Motion should be taken for nothing more than yet another attempt by ProFad's new counsel to delay these proceedings and deny WGMA its day in court.

5. Finally, ProFad argues that its motion should be granted because it would be "a waste of resources for the parties to continue forward with pre-trial issues". *See* Motion at ¶ 2. This disingenuous argument ignores the fact that it was ProFad's new counsel that insisted on continuing the trial date and re-opening discovery to take additional depositions.  Under the then-

---

[1] Of course, it was the ProFad's decision not to have findings of fact and conclusions of law entered.  After WGMA prepared findings of fact and conclusions of law, ProFad requested that only a simply denial of the motion to arbitrate be entered.

current scheduling order, discovery was complete and the case was ready for trial.  ProFad should not be able to claim that conducting the additional discovery that it begged for would be a waste of resources and a basis for granting the stay.   Thus, any alleged inefficiency is of ProFad's own doing.  Accordingly, ProFad's Motion should be denied.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, PLAINTIFF WEST GULF MARITIME ASSOCIATION respectfully requests that the Court deny Professional Advantage Software Solutions, Inc.'s Motion to Stay Proceedings, and award WGMA such other and further relief to which it may be justly entitled.

Dated: December 3, 2015.

Respectfully submitted,

**CARRIGAN, McCLOSKEY & ROBERSON, L.L.P.**


By:_____/s/Blake E. Rizzo_____
       Timothy M. McCloskey
       SBOT:13417650
       Blake E. Rizzo
       SBOT: 24034073
       945 Heights Boulevard
       Houston, Texas 77008
       713-868-5581
       713-868-1275 (fax)

**ATTORNEYS FOR WEST GULF MARITIME ASSOCIATION**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above and foregoing has this 3rd day of December, 2015, been sent in accordance with Texas Rule of Civil Procedure 21(a) to the following:

Jamey L. Voge
Brian Cooper
STUBER COOPER VOGE, PLLC
2600 Network Blvd., Suite 305
Frisco, Texas  75034
Fax:  (214) 472-2790

Thomas C. Wright
Natasha N. Taylor
WRIGHT & CLOSE, LLP
One Riverway, Suite 2200
Houston, TX 77056
Telephone: (713) 572-4321
Fax: (713) 572-4320

*Attorneys for Defendant, Professional Advantage Software Solutions, Inc.*

/s/Blake E. Rizzo
Blake E. Rizzo

# TAB F

REPORTER'S RECORD

VOLUME 1 OF 1 VOLUME

CAUSE NO. 2012-58827

COURT OF APPEALS CASE NO. 01-15-01006-CV

WEST GULF MARITIME ASSOCIATION, )IN THE DISTRICT COURT
INC.,                          )
                 *Plaintiff,*   )
                               )
VS.                            )HARRIS COUNTY, TEXAS
                               )
BUSINESS MICROVAR, INC., D/B/A )
INTERDYN BMI, PROFESSIONAL     )
ADVANTAGE SOFTWARE SOLUTIONS,  )
INC., AND TECHNOLOGY SUPPORT,  )
INC.,                          )
                 *Defendants.*   )151ST JUDICIAL DISTRICT


*******************************

MOTION FOR ARBITRATION

*******************************


On the 9th day of November, 2015, the

following proceedings came on to be heard in the

above-entitled and numbered cause before the Honorable

Mike Engelhart, Judge Presiding, held in Houston,

Harris County, Texas.


Proceedings reported by computer-aided

transcription/stenograph machine.

A P P E A R A N C E S

Mr. Timothy McCloskey
SBOT NO. 13417650
tmccloskey@cmrllp.com
Mr. Blake Rizzo
SBOT NO. 24034073
brizzo@cmrllp.com
CARRIGAN MCCLOSKEY & ROBERSON LLP
945 Heights Boulevard
Houston, Texas 77008
Phone:   (713) 868-5581
ATTORNEYS FOR THE PLAINTIFF
WEST GULF MARITIME ASSOCIATION, INC.

- AND -

Mr. Jamey L. Voge
SBOT NO. 24033424
jvoge@scvlaw.net
STUBER COOPER VOGE PLLC
2600 Network Boulevard, Suite 305
Frisco, Texas 75034
Phone:   (214) 472-2770
ATTORNEY FOR THE DEFENDANT
PROFESSIONAL ADVANTAGE SOFTWARE SOLUTIONS, INC.

VOLUME 1 OF 1 VOLUME

MOTION FOR ARBITRATION

CHRONOLOGICAL INDEX

NOVEMBER 9, 2015                                    PAGE

Appearances . . . . . . . . . . . . . . . . . . .2

Chronological Index . . . . . . . . . . . . . . .3

Proceedings . . . . . . . . . . . . . . . . . . .4

Statements by Mr. Voge . . . . . . . . . . . . . 4

Response by Mr. Rizzo. . . . . . . . . . . . . .11

Court's Ruling . . . . . . . . . . . . . . . . .24

Recessed . . . . . . . . . . . . . . . . . . . .26

Reporter's Certificate . . . . . . . . . . . . .27

Word Index . . . . . . . . . . . . . . . . . . .28

(No exhibits)

P R O C E E D I N G S

THE COURT: This is 2012-588227 West Gulf Maritime versus Business Microvar, Inc., et al, page 7 of today's docket. And it is the Defendant's Motion to Compel Arbitration. And there's a response on file. Movant's counsel, would you tell us who you are and who you represent, please.

MR. VOGE: Jamey Voge; Stuber, Cooper, Voge. I represent Professional Advantage Software Solutions, Inc., Defendant.

THE COURT: How do you spell your last name? V-O-G-E, right?

MR. VOGE: Correct.

MR. RIZZO: Good morning, Your Honor. Blake Rizzo, R-I-Z-Z-O, here with my partner Tim McCloskey. We're here for West Gulf Maritime Association.

THE COURT: Okay. I read the motion and the response and I'm familiar with the law in this area. So let me briefly hear you on your motion, and then I'll hear their response.

MR. VOGE: Thank goodness. The issue before you is very focused. We've got a valid agreement to arbitrate. We've got no dispute over the scope of that agreement. The allegation made by the Plaintiff is

that we have waived our right to compel arbitration.

THE COURT: Yes.

MR. VOGE: I'm happy to hear that you are familiar with the law on this issue because there's a lot of it.

The hurdle for the Plaintiff is huge. According to our own Supreme Court, it's their burden of proof to prove with evidence that the Defendant has substantially invoked the litigation process to their detriment and caused them prejudice.

I will submit to you that not only have we not caused them prejudice, they have benefited from us waiting to this point in the process to raise this issue. Okay.

Bear in mind, this is a multimillion-dollar dispute involving multiple parties. When it was filed back in 2012, it's understandable why all three Defendants were included in the lawsuit. The Plaintiff picked this forum, not us.

And presumably, only Professional Advantage had an agreement to arbitrate. So for three years we rocked along with other parties in the case, with streamline discovery, consolidated discovery and pretrial. They have benefited from the consolidated mediation effort. All of the discovery that has been

done, which I will submit to you is minimal -- we've taken one deposition, the Defendant has, one.

The case was on file for 19 months before we ever even sent a request for disclosure. I mean, we've done nothing more as a Defendant other than the bare minimum necessary to keep our head above the water.

So the little discovery that has been done, was done in a consolidated manner with the other Defendants involved as opposed to the alternative, which would have been had we raised this issue from day one, you would have had one dispute here pending in your court with discovery ongoing in a trial at some point in the future, and then you would have had a segregated action against my client with presumably duplicative discovery and the risk of inconsistent results.

Instead, they have essentially gotten the benefit of a consolidation and up until the very end. And now there's absolutely no evidence of any prejudice to arise out of being compelled to live by the agreement that they don't dispute exists.

There's no more money to be spent. We've taken one deposition. We've agreed that we're going to take a few more. The discovery has been done or will be done. Everything that has been done could have been done under the AAA rules. They're going to say, well,

you filed a counterclaim. Look at the counterclaim. It's purely defensive. We've done almost -- it's a dec action. And in response to a request for disclosure, we don't even lay out a damage model, we don't even say that we want money. We've done almost no discovery on that affirmative claim, if it even is an affirmative claim. We've not filed any motions for summary judgment with respect to our counterclaim. We've merely played defense.

The reason I'm here and the reason there's been a change of lawyers in the past 60 days is because so little has been done. I will submit to you that the clients incurred more fees in the past 75 days with me at the wheel than they've spent in the three years before that. And bearing in mind, the three years before that, that delay wasn't all our fault. It was because you had multiple parties.

So there's nothing that's been done that could have been avoided in arbitration. There's nothing to be done that is any more expensive or more burdensome than it will be in arbitration.

In fact, I will submit to you that there's an additional benefit, in that it's going to be much cheaper to present this highly technical software issue to an arbitrator than it would be to come in here and

attempt to present the same case to a jury.

So in terms of the law, I don't think we disagree much. The very Supreme Court case that they cite, In re Vesta, is a case where the Court looked at all the factors. And even though there had been a counterclaim, there had been a motion for summary judgment, there had been depositions taken, the Court said, look, we agree essentially that under certain circumstances a party can waive the right to arbitration, but we disagree that the record here shows that they did so. At least not to the degree necessary to overcome the presumption against waiver.

Sure, could we have raised this issue before now? Yes. And I can't explain to you why it was never raised. I can tell you that the client was not aware until 60 days ago that they even had this right, which is why I'm the one standing here before you and not my predecessor.

But they admit -- they being Plaintiff, they admit in their response that the burden is theirs and that the hurdle is a high one and that they must show prejudice. And they go on to define it for us.

And they say in the context of waiver under the FAA, it relates to inherent unfairness. I ask you, where is the inherent unfairness? How is anybody

worse off if we now say, okay, let's go to North Dakota and arbitrate this case, like we long ago agreed.

They go on to say that -- they cite this case, the Perry Homes, which is an egregious case. I mean, in that case it got all the way to the Supreme Court and the party then attempting to avoid arbitration -- or attempting to compel arbitration had previously filed a 79-page brief saying that AAA was a bunch of knotheads and that they were expensive and inefficient. I understand why in that case the Court said, wait a minute, you can't have it one way then and another way now; you waived your right to arbitrate.

Since then there have been -- I think there's one other Supreme Court opinion out of all the cases on this issue where the Court has actually said, okay, you've met this huge burden and you've actually established waiver and that you've suffered some prejudice. The problem here is the Plaintiff can't show prejudice. There's no evidence before you whatsoever that they're going to now be worse off than they would have been.

Sure, they had to exchange documents with us. You would have had to have done that under the AAA rules. Sure, you had to respond to a more than one motion for summary judgment. All of which were on

defensive matters. You would have had to have done that under the AAA rules.

They suggest that we've purposefully and unjustifiably -- that we're manipulating the exercise of its arbitrable rights to gain an unfair tactical advantage after aggressively litigating this case for three years. That's laughable, "aggressively litigating."

We've swapped documents, sent some very generic written discovery and taken one deposition. It's comical to suggest that we've been aggressively litigating this for three years. We didn't even file a counterclaim. It was less than a year ago when we filed the counterclaim.

The unfair tactical advantage, I just -- again, I don't disagree with the law that they cite; but there's no evidence that they have been prejudiced, which they admit is their burden to prove. They say that their legal position has been damaged. I just don't -- I can't appreciate that there's any legitimate reason that overcomes this huge burden of theirs in favor of this notion that we've waived the right to arbitrate through this aggressive litigation that we've engaged in.

THE COURT: I get it. I get it. Do you

have anything new?

        *MR. VOGE:* No.

        *THE COURT:* Okay. Response?

        *MR. RIZZO:* Yes, Your Honor. I think what's laughable is the fact that we're --

        *THE COURT:* Nothing is laughable. I'm not a jury. Can we just talk about the law and the facts?

        *MR. RIZZO:* Sure, Judge. I think that this is a case that clearly shows that ProFad has waived its right to arbitrate by substantially invoking the judicial process.

        There are three Texas Supreme Court cases -- the Vesta case, the Perry Homes case and the Fleetwood case -- that have specifically said that a party that conducts full discovery, files motions going to the merits, and seeks arbitrations on the eve of trial waives any contractual right to arbitration. And all three of those factors are present herein.

        ProFad conducted full discovery. They sent 71 requests for admissions, 17 interrogatories, 38 requests for production, which caused us to produce over 77,000 pages of documents at over 6 grand.

        They submitted and responded to requests for disclosures. They issued three third-party subpoenas requesting documents, and they participated in

three depositions. They also filed five summary judgment motions, Judge, two no-evidence and three traditional. And to sit here and say that they were not actively pursuing this litigation is just wrong.

If you look at their counterclaim, Your Honor, which is tab 8 attached to my affidavit, they claim that the damages -- WGMA's damages are limited to the price paid by WGMA for the PAM software. That comes from the very software licensing agreement at issue right now. They filed a motion for summary judgment trying to limit our damages based on that software agreement.

They also claim in their counterclaim that we have waived any implied or express warranties other than those listed in the license agreement. They filed a motion for summary judgment on that issue.

Their declaratory judgment action is definitely affirmative in nature. They seek a dec action and attorney's fees.

And they also sought arbitration on eve of trial, Judge. And based on these factors alone, we believe that Supreme Court authority is clear that they have substantially invoked arbitration.

And the courts have said, well, if only two of those factors are met, then you can look at the

totality of the circumstances. And again, courts have outlined a number of factors, including filing an answer, filing a counterclaim, pursuing discovery, moving for a continuance, and timely -- and failing to timely request arbitration. Again, all of those factors are present in this case.

And we've cited in our reply, Your Honor, several cases that are directly on point. Where, for instance, starting on page 6 in our reply, the Ideal Roofing case, arbitration is waived, where Ideal filed a depositive motions (sic) on the merits in the form of a summary judgment. Motion was set twice for hearing. Appellants propounded written discovery on the merits, attended a mediation and sought arbitration after the case had been pending for 19 1/2 months. The Court found waiver.

Again, Adams versus StaxxRing, arbitration --

*THE COURT:* I'm sorry. Adams versus?

*MR. RIZZO:* StaxxRing, on page 6 --

*THE COURT:* No. Would you spell it for our court reporter.

*MR. RIZZO:* Okay. S-T-A-X-X, capital R-I-N-G.

*THE COURT:* Thank you.

*MR. RIZZO:* Arbitration was waived, where Adams filed answer, affirmative defense, counterclaims, brought in third parties, engaged in discovery, and filed motions to compel.

Again, in the Christus case, C-H-R-I-S-T-U-S, noting that actions inconsistent with the right to arbitration include some combination of filing an answer and counterclaim, conducting extensive discovery, moving for continuance, and failing to timely request arbitration.

Judge, all of the actions taken in this case by ProFad have been specific and deliberate and they've gone to the merits. They have clearly evinced the desire to litigate the claims in this case.

Now, if you don't believe that the three factors in the Supreme Court control, you also look to prejudice. But Perry Hill has instructed that the burden is much easier on prejudice when they have waited a long time to bring the right to arbitrate.

Perry has also instructed that you look at the fact of prejudice, not just the extent thereof.

And counsel quoted for you the definition that Perry Hill's talked about when determining prejudice. And they said it refers to the inherent unfairness.

But it goes on to say inherent unfairness in the terms of delay, which we have here, expense, which we have as outlined in my affidavit, and damage to a party's legal position that occurs when the party opponent forces it to litigate an issue and later seeks to arbitrate that same issue. That's exactly what we have here, Your Honor.

Motions for summary judgment that were filed in this case required us to basically marshal our evidence and respond and give up our legal positions. Counsel says, oh, they would have had to do that in arbitration anyway. But that's not true, Your Honor.

If you look at the rules, and I have a copy here if you would like to see them, Rule 33 says that motions for summary --

*THE COURT:* Rule 33 of what, the AAA rules?

*MR. RIZZO:* The AAA rules, yes. Rule 33 says that an arbitrator may allow summary judgment motions but only if it determines that they're likely to succeed on the merits.

Clearly no-evidence motions for summary judgment wouldn't be allowed in arbitration. And I think given the fact that all five of their motions for summary judgment have been denied would be kind of

hard-pressed for an arbitrator to find that they would likely proceed.

So again, Judge, the fact that we had to actually respond to those --

THE COURT: You mean succeed.

MR. RIZZO: Succeed, yes.

THE COURT: And doesn't that argument kind of cut in their favor, that they've lost -- theoretically that -- they've lost all these motions, so they're not likely to -- you're not likely to have to deal with any further motions in the arbitration context?

MR. RIZZO: No. But it goes to the fact that they have forced us to marshal our evidence and show our legal position --

THE COURT: I understood that part.

MR. RIZZO: Yeah.

THE COURT: I understood that part. I was just addressing the very last part that you made. But please continue.

MR. RIZZO: Okay. In any event, Your Honor, again, we cite on page 9, numerous cases which have taken that exact definition that I just gave you and found prejudice. Again, it's not a high burden, because they waited so long.

For example, the Oak Partners case on page 9 says that -- they concluded that the Plaintiff showed prejudice when the Defendant delayed 19 months before moving to compel arbitration.

During which time it actively pursued litigation, sought discovery and actively sought relief from the Trial Court, which forced Plaintiff to respond and incur attorney's fees. Jones v. Citibank, "holding appellant waived her right to arbitrate when she waited for over two years to request arbitration, and by that time had filed numerous motions, including a motion to dismiss, a counterclaim, and opposition to summary judgment."

Judge, we believe that it's just clear that they've waived their right to arbitrate in this case.

And I would like to point out, based on their reply and some of the other arguments that have been made today, the Supreme Court in Perry Homes also says that you can't look at what an arbitrator may or may not do to deny prejudice.

In other words, just because an arbitrator may allow extensive discovery doesn't mean that you weren't prejudiced in this case by having to go through that. Because the only thing that the rules say is that

the arbitrator may allow the exchange of documents. It doesn't say it will. And it also doesn't speak of requests for admissions or interrogatories.

Under the Supreme Court authority we've been prejudiced because you look at the fact, not the extent. We had to respond to request for admissions. We had to respond to interrogatories. We wouldn't do that in arbitration.

Finally, Judge, if you look at the cases that they cited in support of their motion, they are wholly inapplicable on a factual basis in this case. I know that the Court can read them but I just -- you know, for example, they cite the Terminix case, and the only thing that was under the Terminix case was an answer was filed, one set of interrogatories were filed, and they moved to compel arbitration within six months.

Richmond -- Richmond didn't even request discovery. The only thing he did was fail to respond to some discovery requests, and no trial date had been set. Obviously, the Court found no waiver. And it's just on and on, Judge.

I think the law is definitely in our favor. They've substantially invoked the process. We have been prejudiced, as outlined in my response and the in the affidavit. And I think that their motion should

be denied.

THE COURT: All right. I'll give you the last word for about 60 seconds.

MR. VOGE: I'm still waiting to see the evidence of prejudice. We've got an outstanding agreement to go take four or five more depositions. Full discovery has not taken place. I'll stipulate on the record, I won't file these motions for summary judgment again before the arbitrator.

But there's no reason to think that we can't go arbitrate this thing in January or February of next year, as much as I don't want to go to North Dakota in January or February.

THE COURT: I don't know whether that's true or not. Typically arbitrations -- there's usually much longer lead time on them.

MR. VOGE: Typically. But there's no reason to -- the discovery will have been done, and there's no reason to duplicate it.

THE COURT: And I'm sure that both arbitrators in North Dakota are booked for at least the next 60 days.

MR. VOGE: Again, Your Honor, it's their burden to show us the evidence of prejudice. We simply haven't seen it. It's not there. In fact, we've done

them a favor. We've streamlined the discovery, we've narrowed the issues.

My other point is this, with or without professional advantage in this case, the path that they chose and the path that they have now taken for three years is a path that they would have had to have taken with or without us in this case. Because of the other parties that they've now settled with.

So now that we've narrowed the issues, culled out the two other parties, you've got some money in your pocket, you've done the discovery, let's go arbitrate it, as we agreed. There's no prejudice to them whatsoever. We've saved them a fortune by waiting this long to do it.

THE COURT: When did I reset this for trial?

MR. MCCLOSKEY: January 18th, I believe, Your Honor. Your second docket in January.

THE COURT: 18th, yeah. Did I assign you? Is this case preferentially set? You might need to ask Corina.

MR. MCCLOSKEY: Judge, there's one that you assigned CTDB versus Frills (phonetic) and --

THE COURT: Right.

MR. MCCLOSKEY: It was like their eighth

or ninth continuance and --

THE COURT: Out there ahead of you?

MR. HUDGINS: Well, I'm on that case too, but you actually assigned us.

THE COURT: Is that that setting?

MR. MCCLOSKEY: Yeah. I think it's that setting.

MR. VOGE: For what it's worth, Your Honor, there's no assurance that we're going to trial in January.

THE COURT: No --

MR. VOGE: If we go select an arbitrator and get on his schedule in January or February or March, then you don't have the risk and the expense associated with gearing up, ramping up and getting pushed out to the next docket.

It's -- again, there is no prejudice by moving this to arbitration with an agreed-upon, locked-in schedule. We've done the discovery. We go tee it up in North Dakota and get it over with. We've saved you money, again.

MR. MCCLOSKEY: The trial date --

MR. VOGE: The thing's been on the docket for three years and nobody's been in a hurry to make it go away. What's another three or four months?

THE COURT: I get it. I understand.

THE CLERK: It's not set.

THE COURT: Okay. Here's the question that I have for you all. If I were to deny their motion -- I just want to ask this question out loud and get a response -- I imagine they will file -- they will -- I don't remember if it's an interlocutory appeal or mandamus.

MR. VOGE: Here's the other risk. If you deny it -- and I'm not putting words in your mouth, and I apologize for interrupting you.

If you deny it because of the other moving parts behind the scene and why this was just now raised, I have to appeal it.

So here's the risk. The trial goes on in January before we hear back from the appellate court. And as has happened in the Perry Homes case, we might go try this thing for naught and then have the appellate court go, oh, never mind, bring it back and go to North Dakota. You want to talk about a waste of money? Now we've all wasted a bunch of money. And unfortunately, that's an avenue because of what's going on --

THE COURT: No, I understand.

MR. VOGE: -- in the background, I have to exhaust all available efforts to compel arbitration.

THE COURT: Yes. No, I totally understand. I assumed there would be -- is it interlocutory, or is it a mandamus? I forget with arbitrations. I can't remember. Is it part of the statute or is it-- it's Chapter 51.

MR. RIZZO: I think I've read in some of the cases --

MR. VOGE: It's 016, I think --

THE COURT: One at a time. One at a time.

MR. RIZZO: Sorry. I think I've read in some of the cases that it's interlocutory, Your Honor.

MR. VOGE: My appellate lawyer tells me that the show goes on.

THE COURT: Right. It doesn't stay the trial. It stays the -- unless the court of appeals stays it.

MR. VOGE: Right.

THE COURT: Perhaps.

MR. VOGE: Right.

THE COURT: Stand by.

(Court reviewing book)

THE COURT: I don't think it's in the -- I think it's in that Chapter 51, interlocutory appeals.

MR. VOGE: I want to say 54.016.

THE COURT: I don't think that's right.

MR. VOGE: But it may be 51, Your Honor.

THE COURT: It talks about an appeal under the Federal Arbitration Act, and it talks about the circumstances under which one can take an appeal being similar to a Federal District Court decision.

(Court reviewing book)

COURT'S RULING

THE COURT: I don't know. I mean, it's going to get to the court of appeals either way, I imagine. I really do think that you have substantially invoked the litigation process. And so I'm going to deny your motion to compel arbitration. I do think this comes squarely under the recent case law.

MR. VOGE: Would you do me the favor of articulating in your order why you've denied it?

THE COURT: Sure. Why don't y'all submit -- I don't think you've submitted a proposed order. If you would incorporate, it doesn't have to be all of your reasons, but an outline of your response in the order? I would appreciate that. And I can mark it up if there's something I want to add or take out.

MR. MCCLOSKEY: We will do it, Your Honor.

THE COURT: Okay. Can I get that, let's say, end of the day Wednesday? Is that doable?

MR. RIZZO: Yes, Your Honor.

THE COURT: Yes, I know. Yes.

MR. RIZZO: Yes, Your Honor.

MR. VOGE: Let me throw this at you.

THE COURT: Sure.

MR. VOGE: Some of my research suggests that given the appeals process in play, that one of our options would be to ask you to stay this trial -- to stay this litigation as opposed to us going and spending 150, $200,000 only to potentially be told in February that we have to go do it over again someplace else, would you be inclined to entertain a motion to stay this litigation while we wait to hear from the appeal court?

THE COURT: I will read any motion that you file and you should confer with them ahead of time in a substantive manner to determine what you-all think is the most efficient way to proceed and then -- and you are welcome to set that for submission, and I will rule on it. I think that's the best way to approach that, as is my norm. Okay?

MR. VOGE: All right.

THE COURT: Very good.

MR. MCCLOSKEY: May we be excused?

THE COURT: Yes. Make sure I get that order, make sure you circulate it before you file it. Okay?

MR. RIZZO: Will do.

THE COURT: And electronically file it.

MR. RIZZO: Thank you.

MR. MCCLOSKEY: Thank you, Your Honor.

THE COURT: Thank you very much.

(Recessed)

*STATE OF TEXAS*

*COUNTY OF HARRIS*

*I, Carolyn Ruiz Coronado, CSR, RPR, Official Court Reporter in and for the 151st District Court of Harris County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.*

*I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.*

*I further certify that the total cost for the preparation of this Reporter's Record is $336.00 and will be paid by Ms. Natasha N. Taylor, WRIGHT & CLOSE LLP.*

*WITNESS MY OFFICIAL HAND this the 5th day of December, 2016.*

> */s/Carolyn Ruiz Coronado*
> *CAROLYN RUIZ CORONADO, CSR, RPR*
> *Texas CSR 7113*
> *Official Court Reporter*
> *151st District Court*
> *201 Caroline, 11th floor*
> *Houston, Texas  77002*
> *Telephone:  (713) 368-6212*
> *Expiration:  12/31/2016*

MR. HUDGINS: [1] 21/2
MR. MCCLOSKEY: [8] 20/16 20/21 20/24 21/5 21/21 24/21 25/21 26/3
MR. RIZZO: [17] 4/13 11/3 11/7 13/19 13/22 13/25 15/17 16/5 16/12 16/16 16/20 23/5 23/9 24/24 25/1 25/25 26/2
MR. VOGE: [23] 4/7 4/12 4/21 5/2 11/1 19/3 19/16 19/22 21/7 21/11 21/22 22/8 22/23 23/7 23/11 23/16 23/18 23/23 23/25 24/13 25/2 25/4 25/19
THE CLERK: [1] 22/1
THE COURT: [45]

**$**

$200,000 [1] 25/9
$336.00 [1] 27/11

**/**

/s/Carolyn [1] 27/16

**0**

016 [1] 23/8

**1**

1/2 [1] 13/15
11th [1] 27/19
12/31/2016 [1] 27/20
150 [1] 25/9
151st [2] 27/4 27/18
17 [1] 11/20
18th [2] 20/17 20/19
19 [3] 6/3 13/15 17/3

**2**

201 [1] 27/19
2012 [1] 5/17
2012-588227 [1] 4/2
2016 [2] 27/15 27/20

**3**

33 [3] 15/14 15/16 15/18
368-6212 [1] 27/20

38 [1] 11/20

**5**

51 [3] 23/5 23/23 24/1
54.016 [1] 23/24
588227 [1] 4/2
5th [1] 27/14

**6**

60 [4] 7/11 8/16 19/3 19/22
6212 [1] 27/20

**7**

71 [1] 11/20
7113 [1] 27/17
713 [1] 27/20
75 [1] 7/13
77,000 [1] 11/22
77002 [1] 27/19
79-page [1] 9/8

**A**

AAA [6] 6/25 9/8 9/23 10/2 15/16 15/18
about [6] 11/7 14/23 19/3 22/20 24/2 24/3
above [3] 6/6 27/5 27/7
above-styled [1] 27/7

**A**

absolutely [1] 6/18
According [1] 5/7
Act [1] 24/3
action [4] 6/14 7/3 12/17 12/19
actions [2] 14/6 14/11
actively [3] 12/4 17/5 17/6
actually [4] 9/15 9/16 16/4 21/4
Adams [3] 13/17 13/19 14/2
add [1] 24/21
additional [1] 7/23
addressing [1] 16/19
admissions [3] 11/20 18/3 18/6
admit [3] 8/19 8/20 10/18
advantage [5] 4/9 5/21 10/6 10/15 20/4
affidavit [3] 12/6 15/3 18/25
affirmative [4] 7/6 7/6 12/18 14/2
after [2] 10/6 13/14
again [13] 10/16

13/1 13/5 13/17 14/5 16/3 16/22 16/24 19/9 19/23 21/17 21/21 25/10
against [2] 6/14 8/12
aggressive [1] 10/23
aggressively [3] 10/6 10/7 10/11
ago [3] 8/16 9/2 10/13
agree [1] 8/8
agreed [4] 6/22 9/2 20/12 21/18
agreed-upon [1] 21/18
agreement [8] 4/23 4/25 5/21 6/19 12/9 12/12 12/15 19/6
ahead [2] 21/2 25/14
al [1] 4/3
all [21] 5/18 5/25 7/16 8/5 9/5 9/14 9/25 11/18 13/5 14/11 15/24 16/9 19/2 22/4 22/21 22/25 24/18 25/15 25/20 27/6 27/7
allegation [1] 4/25

allow [3] 15/19 17/23 18/1
allowed [1] 15/23
almost [2] 7/2 7/5
alone [1] 12/21
along [1] 5/22
also [7] 12/1 12/13 12/20 14/16 14/20 17/19 18/2
alternative [1] 6/9
another [2] 9/12 21/25
answer [4] 13/3 14/2 14/8 18/15
any [10] 6/18 7/7 7/20 10/20 11/17 12/14 16/11 16/21 25/13 27/10
anybody [1] 8/25
anything [1] 11/1
anyway [1] 15/12
apologize [1] 22/11
appeal [5] 22/7 22/14 24/2 24/4 25/12
appeals [4] 23/15 23/23 24/9 25/6
appellant [1] 17/9
Appellants [1] 13/13
appellate [3] 22/16

**A**

appellate... [2] 22/18 23/12
appreciate [2] 10/20 24/20
approach [1] 25/18
arbitrable [1] 10/5
arbitrate [12] 4/24 5/21 9/2 9/12 10/23 11/10 14/19 15/6 17/9 17/15 19/11 20/12
arbitration [28]
arbitrations [3] 11/16 19/15 23/4
arbitrator [8] 7/25 15/19 16/1 17/20 17/22 18/1 19/9 21/12
arbitrators [1] 19/21
are [11] 4/6 5/3 11/12 11/18 12/7 12/25 13/6 13/8 18/10 19/21 25/17
area [1] 4/19
argument [1] 16/7
arguments [1] 17/18
arise [1] 6/19
articulating [1]

24/15
as [10] 6/5 6/9 15/3 18/24 19/12 19/12 20/12 22/17 25/8 25/18
ask [4] 8/24 20/20 22/5 25/7
assign [1] 20/19
assigned [2] 20/23 21/4
associated [1] 21/14
Association [1] 4/17
assumed [1] 23/2
assurance [1] 21/9
attached [1] 12/6
attempt [1] 8/1
attempting [2] 9/6 9/7
attended [1] 13/14
attorney's [2] 12/19 17/8
authority [2] 12/22 18/4
available [1] 22/25
avenue [1] 22/22
avoid [1] 9/6
avoided [1] 7/19
aware [1] 8/16
away [1] 21/25

**B**

back [3] 5/17 22/16 22/19
background [1] 22/24
bare [1] 6/6
based [3] 12/11 12/21 17/17
basically [1] 15/9
basis [1] 18/11
be [19] 6/21 6/23 7/20 7/21 7/23 7/25 9/20 15/23 15/25 19/1 23/2 24/1 24/18 25/7 25/9 25/11 25/22 27/6 27/12
Bear [1] 5/15
bearing [1] 7/15
because [10] 5/4 7/11 7/17 16/25 17/22 17/25 18/5 20/7 22/12 22/22
been [28]
before [11] 4/23 6/3 7/15 7/16 8/14 8/17 9/19 17/3 19/9 22/16 25/24
behind [1] 22/13
being [3] 6/19 8/19 24/4
believe [4] 12/22

## B

believe... [3]  14/15 17/14 20/17
benefit [2]  6/17 7/23
benefited [2]  5/12 5/24
best [1]  25/18
Blake [1]  4/15
book [2]  23/21 24/6
booked [1]  19/21
both [1]  19/20
brief [1]  9/8
briefly [1]  4/20
bring [2]  14/19 22/19
brought [1]  14/3
bunch [2]  9/9 22/21
burden [8]  5/7 8/20 9/16 10/18 10/21 14/18 16/24 19/24
burdensome [1]  7/20
Business [1]  4/3

## C

C-H-R-I-S-T-U-S [1]  14/6
can [8]  8/9 8/15 11/7 12/25 18/12 24/4 24/20 24/23
can't [7]  8/14 9/11 9/18 10/20 17/20 19/11 23/4
capital [1]  13/23
Caroline [1]  27/19
Carolyn [3]  27/4 27/16 27/17
case [34]
cases [7]  9/15 11/13 13/8 16/22 18/9 23/7 23/11
cause [1]  27/7
caused [3]  5/10 5/12 11/21
certain [1]  8/8
certify [3]  27/5 27/9 27/11
chambers [1]  27/8
change [1]  7/11
Chapter [2]  23/5 23/23
cheaper [1]  7/24
chose [1]  20/5
Christus [1]  14/5
circulate [1]  25/24
circumstances [3]  8/9 13/1 24/4
cite [5]  8/4 9/3 10/16 16/22 18/13
cited [2]  13/7 18/10
Citibank [1]  17/8
claim [4]  7/6 7/7 12/7 12/13
claims [1]  14/14
clear [2]  12/22 17/14
clearly [3]  11/9 14/13 15/22
client [2]  6/14 8/15
clients [1]  7/13
CLOSE [1]  27/12
combination [1]  14/7
come [1]  7/25
comes [2]  12/8 24/13
comical [1]  10/11
compel [8]  4/5 5/1 9/7 14/4 17/4 18/16 22/25 24/12
compelled [1]  6/19
concluded [1]  17/2
conducted [1]  11/19
conducting [1]  14/8
conducts [1]  11/15
confer [1]  25/14
consolidated [3]  5/23 5/24 6/8
consolidation [1]

## C

consolidation... [1] 6/17

contains [1] 27/5

context [2] 8/23 16/12

continuance [3] 13/4 14/9 21/1

continue [1] 16/20

contractual [1] 11/17

control [1] 14/16

Cooper [1] 4/8

copy [1] 15/14

Corina [1] 20/21

Coronado [3] 27/4 27/16 27/17

correct [2] 4/13 27/5

correctly [1] 27/9

cost [1] 27/11

could [3] 6/24 7/19 8/13

counsel [4] 4/6 14/22 15/11 27/6

counterclaim [11] 7/1 7/1 7/8 8/6 10/13 10/14 12/5 12/13 13/3 14/8 17/12

counterclaims [1] 14/2

COUNTY [2] 27/2 27/5

court [32]

COURT'S [1] 24/7

courts [2] 12/24 13/1

CSR [3] 27/4 27/17 27/17

CTDB [1] 20/23

culled [1] 20/10

cut [1] 16/8

## D

Dakota [5] 9/1 19/12 19/21 21/20 22/20

damage [2] 7/4 15/3

damaged [1] 10/19

damages [3] 12/7 12/7 12/11

date [2] 18/19 21/22

day [3] 6/10 24/24 27/14

days [4] 7/11 7/13 8/16 19/22

deal [1] 16/11

dec [2] 7/2 12/18

December [1] 27/15

decision [1] 24/5

declaratory [1] 12/17

Defendant [5] 4/10 5/8 6/2 6/5 17/3

Defendant's [1] 4/4

Defendants [2] 5/18 6/9

defense [2] 7/9 14/2

defensive [2] 7/2 10/1

define [1] 8/22

definitely [2] 12/18 18/22

definition [2] 14/22 16/23

degree [1] 8/11

delay [2] 7/16 15/2

delayed [1] 17/3

deliberate [1] 14/12

denied [3] 15/25 19/1 24/15

deny [5] 17/21 22/4 22/10 22/12 24/12

deposition [3] 6/2 6/22 10/10

depositions [3] 8/7 12/1 19/6

depositive [1] 13/11

**D**

desire [1] 14/14
determine [1] 25/15
determines [1] 15/20
determining [1] 14/23
detriment [1] 5/10
did [4] 8/11 18/18 20/15 20/19
didn't [2] 10/12 18/17
directly [1] 13/8
disagree [3] 8/3 8/10 10/16
disclosure [2] 6/4 7/3
disclosures [1] 11/24
discovery [24] 5/23 5/23 5/25 6/7 6/12 6/15 6/23 7/5 10/10 11/15 11/19 13/3 13/13 14/3 14/9 17/6 17/23 18/18 18/19 19/7 19/18 20/1 20/11 21/19
dismiss [1] 17/12
dispute [4] 4/24 5/16 6/11 6/20

District [3] 24/5 27/4 27/18
do [13] 4/11 10/25 15/11 17/21 18/7 20/14 24/10 24/12 24/14 24/22 25/10 26/1 27/5
doable [1] 24/24
docket [4] 4/4 20/18 21/16 21/23
documents [5] 9/22 10/9 11/22 11/25 18/1
doesn't [6] 16/7 17/23 18/2 18/2 23/14 24/18
dollar [1] 5/16
don't [16] 6/20 7/4 7/4 8/2 10/16 10/20 14/15 19/12 19/14 21/14 22/7 23/22 23/25 24/8 24/16 24/17
done [19] 6/1 6/5 6/8 6/8 6/23 6/24 6/24 6/25 7/2 7/5 7/12 7/18 7/20 9/23 10/1 19/18 19/25 20/11 21/19
duplicate [1] 19/19
duplicative [1] 6/14

During [1] 17/5

**E**

easier [1] 14/18
efficient [1] 25/16
effort [1] 5/25
efforts [1] 22/25
egregious [1] 9/4
eighth [1] 20/25
either [1] 24/9
electronically [1] 26/2
else [1] 25/10
end [2] 6/17 24/24
engaged [2] 10/24 14/3
entertain [1] 25/11
essentially [2] 6/16 8/8
established [1] 9/17
et [1] 4/3
eve [2] 11/16 12/20
even [8] 6/4 7/4 7/4 7/6 8/5 8/16 10/12 18/17
event [1] 16/21
ever [1] 6/4
Everything [1] 6/24
evidence [11] 5/8 6/18 9/19 10/17 12/2 15/10 15/22

## E

evidence... [4] 16/14 19/5 19/24 27/6
evinced [1] 14/13
exact [1] 16/23
exactly [1] 15/6
example [2] 17/1 18/13
exchange [2] 9/22 18/1
excused [1] 25/22
exercise [1] 10/4
exhaust [1] 22/25
exhibits [1] 27/9
exists [1] 6/20
expense [2] 15/2 21/14
expensive [2] 7/20 9/9
Expiration [1] 27/20
explain [1] 8/14
express [1] 12/14
extensive [2] 14/8 17/23
extent [2] 14/21 18/6

## F

FAA [1] 8/24
fact [8] 7/22 11/5 14/21 15/24 16/3 16/13 18/5 19/25
factors [7] 8/5 11/18 12/21 12/25 13/2 13/5 14/16
facts [1] 11/7
factual [1] 18/11
fail [1] 18/18
failing [2] 13/4 14/9
familiar [2] 4/19 5/4
fault [1] 7/16
favor [5] 10/22 16/8 18/23 20/1 24/14
February [4] 19/11 19/13 21/13 25/9
Federal [2] 24/3 24/5
fees [3] 7/13 12/19 17/8
few [1] 6/23
file [8] 4/5 6/3 10/12 19/8 22/6 25/14 25/24 26/2
filed [15] 5/17 7/1 7/7 9/8 10/13 12/1 12/10 12/15 13/10 14/2 14/4 15/9 17/11 18/15 18/15
files [1] 11/15
filing [3] 13/2 13/3 14/8
Finally [1] 18/9
find [1] 16/1
five [3] 12/1 15/24 19/6
Fleetwood [1] 11/14
floor [1] 27/19
focused [1] 4/23
forced [2] 16/14 17/7
forces [1] 15/5
foregoing [1] 27/5
forget [1] 23/3
form [1] 13/11
fortune [1] 20/13
forum [1] 5/19
found [3] 13/16 16/24 18/20
four [2] 19/6 21/25
Frills [1] 20/23
full [3] 11/15 11/19 19/7
further [3] 16/11 27/9 27/11
future [1] 6/13

## G

gain [1] 10/5
gave [1] 16/23
gearing [1] 21/15

## G

generic [1]  10/10
get [9]  10/25 10/25 21/13 21/20 22/1 22/5 24/9 24/23 25/23
getting [1]  21/15
give [2]  15/10 19/2
given [2]  15/24 25/6
go [15]  8/22 9/1 9/3 17/24 19/6 19/11 19/12 20/11 21/12 21/19 21/25 22/17 22/19 22/19 25/10
goes [4]  15/1 16/13 22/15 23/13
going [10]  6/22 6/25 7/23 9/20 11/15 21/9 22/22 24/9 24/11 25/8
gone [1]  14/13
good [2]  4/14 25/21
goodness [1]  4/22
got [5]  4/23 4/24 9/5 19/5 20/10
gotten [1]  6/16
grand [1]  11/22
Gulf [2]  4/2 4/16

## H

had [22]  5/21 6/10 6/11 6/13 7/17 8/5 8/6 8/7 8/16 9/7 9/22 9/23 9/24 10/1 13/15 15/11 16/3 17/11 18/6 18/7 18/19 20/6
HAND [1]  27/14
happened [1]  22/17
happy [1]  5/3
hard [1]  16/1
hard-pressed [1]  16/1
HARRIS [2]  27/2 27/4
has [14]  5/8 5/25 6/2 6/7 6/23 6/24 7/12 9/15 10/19 11/9 14/17 14/20 19/7 22/17
have [51]
haven't [1]  19/25
having [1]  17/24
he [1]  18/18
head [1]  6/6
hear [5]  4/20 4/21 5/3 22/16 25/12
hearing [1]  13/12
her [1]  17/9
here [12]  4/15 4/16 6/11 7/10 7/25 8/10 8/17 9/18 12/3 15/2 15/7 15/14
here's [3]  22/3 22/9 22/15
hereby [1]  27/5
herein [1]  11/18
high [2]  8/21 16/24
highly [1]  7/24
Hill [1]  14/17
Hill's [1]  14/23
his [1]  21/13
holding [1]  17/8
Homes [4]  9/4 11/13 17/19 22/17
Honor [16]  4/14 11/4 12/6 13/7 15/7 15/12 16/22 19/23 20/18 21/9 23/11 24/1 24/22 24/25 25/2 26/4
Houston [1]  27/19
How [2]  4/11 8/25
huge [3]  5/6 9/16 10/21
hurdle [2]  5/6 8/21
hurry [1]  21/24

## I

I'll [3]  4/20 19/2 19/7
I'm [11]  4/19 5/3 7/10 8/17 11/6

# I

I'm... [6]  13/19 19/4 19/20 21/3 22/10 24/11
I've [2]  23/6 23/10
Ideal [2]  13/9 13/10
imagine [2]  22/6 24/10
implied [1]  12/14
inapplicable [1] 18/11
Inc [2]  4/3 4/10
inclined [1]  25/11
include [1]  14/7
included [2]  5/18 27/7
including [2]  13/2 17/11
inconsistent [2] 6/15 14/6
incorporate [1] 24/18
incur [1]  17/8
incurred [1]  7/13
inefficient [1]  9/10
inherent [4]  8/24 8/25 14/24 15/1
instance [1]  13/9
Instead [1]  6/16
instructed [2] 14/17 14/20

interlocutory [4] 22/7 23/3 23/11 23/23
interrogatories [4] 11/20 18/3 18/7 18/15
interrupting [1] 22/11
invoked [4]  5/9 12/23 18/23 24/11
invoking [1]  11/10
involved [1]  6/9
involving [1]  5/16
is [43]
issue [11]  4/22 5/4 5/14 6/10 7/24 8/13 9/15 12/9 12/16 15/5 15/6
issued [1]  11/24
issues [2]  20/2 20/9
it [57]
it's [22]  5/7 5/17 7/2 7/2 7/23 10/11 16/24 17/14 18/20 19/23 19/25 21/6 21/8 21/17 22/2 22/7 23/5 23/8 23/11 23/22 23/23 24/8
its [2]  10/5 11/10

# J

Jamey [1]  4/8
January [7]  19/11 19/13 20/17 20/18 21/10 21/13 22/16
Jones [1]  17/8
Judge [9]  11/8 12/2 12/21 14/11 16/3 17/14 18/9 18/21 20/22
judgment [14]  7/7 8/7 9/25 12/2 12/10 12/16 12/17 13/12 15/8 15/19 15/23 15/25 17/13 19/9
judicial [1]  11/11
jury [2]  8/1 11/7
just [13]  10/15 10/19 11/7 12/4 14/21 16/19 16/23 17/14 17/22 18/12 18/20 22/5 22/13

# K

keep [1]  6/6
kind [2]  15/25 16/7
knotheads [1]  9/9
know [5]  18/12 18/13 19/14 24/8 25/1

## L

later [1]  15/5
laughable [3]  10/7 11/5 11/6
law [7]  4/19 5/4 8/2 10/16 11/7 18/22 24/13
lawsuit [1]  5/18
lawyer [1]  23/12
lawyers [1]  7/11
lay [1]  7/4
lead [1]  19/16
least [2]  8/11 19/21
legal [4]  10/19 15/4 15/10 16/15
legitimate [1] 10/20
less [1]  10/13
let [2]  4/20 25/3
let's [3]  9/1 20/11 24/23
license [1]  12/15
licensing [1]  12/9
like [4]  9/2 15/14 17/17 20/25
likely [4]  15/20 16/2 16/10 16/10
limit [1]  12/11
limited [1]  12/7
listed [1]  12/15
litigate [2]  14/14 15/5

litigating [3]  10/6 10/8 10/12
litigation [7]  5/9 10/23 12/4 17/6 24/11 25/8 25/12
little [2]  6/7 7/12
live [1]  6/19
LLP [1]  27/12
locked [1]  21/19
locked-in [1]  21/19
long [4]  9/2 14/19 16/25 20/14
longer [1]  19/16
look [10]  7/1 8/8 12/5 12/25 14/16 14/20 15/13 17/20 18/5 18/9
looked [1]  8/4
lost [2]  16/8 16/9
lot [1]  5/5
loud [1]  22/5

## M

made [3]  4/25 16/19 17/19
make [3]  21/24 25/23 25/24
mandamus [2] 22/8 23/3
manipulating [1] 10/4
manner [2]  6/8 25/15

March [1]  21/13
Maritime [2]  4/3 4/16
mark [1]  24/20
marshal [2]  15/9 16/14
matters [1]  10/1
may [7]  15/19 17/20 17/21 17/23 18/1 24/1 25/22
McCloskey [1] 4/16
me [6]  4/20 7/13 23/12 24/14 25/3 27/8
mean [5]  6/4 9/5 16/5 17/23 24/8
mediation [2]  5/25 13/14
merely [1]  7/8
merits [5]  11/16 13/11 13/13 14/13 15/21
met [2]  9/16 12/25
Microvar [1]  4/3
might [2]  20/20 22/17
mind [3]  5/15 7/15 22/19
minimal [1]  6/1
minimum [1]  6/6
minute [1]  9/11

## M

model [1] 7/4
money [6] 6/21 7/5 20/10 21/21 22/20 22/21
months [5] 6/3 13/15 17/3 18/16 21/25
more [8] 6/5 6/21 6/23 7/13 7/20 7/20 9/24 19/6
morning [1] 4/14
most [1] 25/16
motion [15] 4/4 4/18 4/20 8/6 9/25 12/10 12/16 13/12 17/11 18/10 18/25 22/4 24/12 25/11 25/13
motions [14] 7/7 11/15 12/2 13/11 14/4 15/8 15/15 15/20 15/22 15/24 16/9 16/11 17/11 19/8
mouth [1] 22/10
Movant's [1] 4/6
moved [1] 18/16
moving [5] 13/4 14/9 17/4 21/18 22/12
Ms [1] 27/12

much [6] 7/23 8/3 14/18 19/12 19/16 26/5
multimillion [1] 5/16
multimillion-dollar [1] 5/16
multiple [2] 5/16 7/17
must [1] 8/21
my [11] 4/15 6/14 8/18 12/6 15/3 18/24 20/3 23/12 25/5 25/19 27/14

## N

name [1] 4/12
narrowed [2] 20/2 20/9
Natasha [1] 27/12
nature [1] 12/18
naught [1] 22/18
necessary [2] 6/6 8/11
need [1] 20/20
never [2] 8/15 22/19
new [1] 11/1
next [3] 19/12 19/22 21/16
ninth [1] 21/1
no [22] 4/24 6/18 6/21 7/5 9/19 10/17

11/2 12/2 13/21 15/22 16/13 18/19 18/20 19/10 19/17 19/19 20/12 21/9 21/11 21/17 22/23 23/1
no-evidence [2] 12/2 15/22
nobody's [1] 21/24
norm [1] 25/19
North [5] 9/1 19/12 19/21 21/20 22/19
not [21] 5/11 5/12 5/19 7/7 8/11 8/15 8/18 11/6 12/3 14/21 15/12 16/10 16/10 16/24 17/21 18/5 19/7 19/15 19/25 22/2 22/10
nothing [4] 6/5 7/18 7/19 11/6
noting [1] 14/6
notion [1] 10/22
now [12] 6/18 8/14 9/1 9/12 9/20 12/10 14/15 20/5 20/8 20/9 22/13 22/20
number [1] 13/2
numbered [1] 27/7
numerous [2] 16/22 17/11

**O**

Oak [1] 17/1
Obviously [1] 18/20
occurred [1] 27/7
occurs [1] 15/4
off [2] 9/1 9/20
offered [1] 27/10
Official [3] 27/4 27/14 27/18
oh [2] 15/11 22/19
okay [11] 4/18 5/14 9/1 9/16 11/3 13/23 16/21 22/3 24/23 25/19 25/25
one [17] 6/2 6/2 6/10 6/11 6/22 8/17 8/21 9/11 9/14 9/24 10/10 18/15 20/22 23/9 23/9 24/4 25/6
ongoing [1] 6/12
only [8] 5/11 5/20 12/24 15/20 17/25 18/14 18/18 25/9
open [1] 27/8
opinion [1] 9/14
opponent [1] 15/5
opposed [2] 6/9 25/8
opposition [1] 17/12
options [1] 25/7

order [4] 24/15 24/17 24/19 25/24
other [13] 5/22 6/5 6/8 9/14 12/14 17/18 17/22 20/3 20/7 20/10 22/9 22/12 27/6
our [15] 5/1 5/7 6/6 7/8 7/16 12/11 13/7 13/9 13/22 15/9 15/10 16/14 16/15 18/22 25/6
out [9] 6/19 7/4 9/14 17/17 20/10 21/2 21/15 22/5 24/21
outline [1] 24/19
outlined [3] 13/2 15/3 18/24
outstanding [1] 19/5
over [6] 4/24 11/21 11/22 17/10 21/20 25/10
overcome [1] 8/12
overcomes [1] 10/21
own [1] 5/7

**P**

page [6] 4/3 9/8 13/9 13/20 16/22 17/1

pages [1] 11/22
paid [2] 12/8 27/12
PAM [1] 12/8
part [4] 16/16 16/18 16/19 23/4
participated [1] 11/25
parties [8] 5/16 5/22 7/17 14/3 20/8 20/10 27/6 27/10
partner [1] 4/15
Partners [1] 17/1
parts [1] 22/13
party [5] 8/9 9/6 11/15 11/24 15/4
party's [1] 15/4
past [2] 7/11 7/13
path [3] 20/4 20/5 20/6
pending [2] 6/11 13/15
Perhaps [1] 23/18
Perry [7] 9/4 11/13 14/17 14/20 14/23 17/19 22/17
phonetic [1] 20/23
picked [1] 5/19
place [1] 19/7
Plaintiff [7] 4/25 5/6 5/19 8/19 9/18 17/2 17/7
play [1] 25/6

## P

played [1]  7/8
please [2]  4/7
 16/20
pocket [1]  20/11
point [5]  5/13 6/12
 13/8 17/17 20/3
portions [1]  27/6
position [3]  10/19
 15/4 16/15
positions [1]  15/10
potentially [1]
 25/9
predecessor [1]
 8/18
preferentially [1]
 20/20
prejudice [17]
 5/10 5/12 6/18 8/22
 9/18 9/19 14/17
 14/18 14/21 14/24
 16/24 17/3 17/21
 19/5 19/24 20/12
 21/17
prejudiced [4]
 10/17 17/24 18/5
 18/24
preparation [1]
 27/11
present [4]  7/24
 8/1 11/18 13/6
pressed [1]  16/1

presumably [2]
 5/20 6/14
presumption [1]
 8/12
pretrial [1]  5/24
previously [1]  9/8
price [1]  12/8
problem [1]  9/18
proceed [2]  16/2
 25/16
proceedings [2]
 27/6 27/9
process [6]  5/9
 5/13 11/11 18/23
 24/11 25/6
produce [1]  11/21
production [1]
 11/21
ProFad [3]  11/9
 11/19 14/12
professional [3]
 4/9 5/20 20/4
proof [1]  5/8
proposed [1]  24/17
propounded [1]
 13/13
prove [2]  5/8 10/18
purely [1]  7/2
purposefully [1]
 10/3
pursued [1]  17/5
pursuing [2]  12/4

13/3
pushed [1]  21/15
putting [1]  22/10

## Q

question [2]  22/3
 22/5
quoted [1]  14/22

## R

R-I-N-G [1]  13/24
R-I-Z-Z-O [1]
 4/15
raise [1]  5/13
raised [4]  6/10
 8/13 8/15 22/13
ramping [1]  21/15
re [1]  8/4
read [5]  4/18 18/12
 23/6 23/10 25/13
really [1]  24/10
reason [6]  7/10
 7/10 10/21 19/10
 19/18 19/19
reasons [1]  24/19
recent [1]  24/13
Recessed [1]  26/6
record [5]  8/10
 19/8 27/7 27/9
 27/11
refers [1]  14/24
reflects [1]  27/9
relates [1]  8/24

# R

relief [1] 17/6
remember [2] 22/7 23/4
reply [3] 13/7 13/9 17/18
reported [1] 27/8
reporter [3] 13/22 27/4 27/18
Reporter's [3] 27/7 27/9 27/11
represent [2] 4/7 4/9
request [7] 6/4 7/3 13/5 14/10 17/10 18/6 18/17
requested [1] 27/6
requesting [1] 11/25
requests [5] 11/20 11/21 11/23 18/3 18/19
required [1] 15/9
research [1] 25/5
reset [1] 20/15
respect [1] 7/8
respective [1] 27/10
respond [7] 9/24 15/10 16/4 17/7 18/6 18/7 18/18
responded [1] 11/23
response [9] 4/5 4/19 4/21 7/3 8/20 11/3 18/24 22/6 24/19
results [1] 6/15
reviewing [2] 23/21 24/6
Richmond [2] 18/17 18/17
right [20] 4/12 5/1 8/9 8/16 9/12 10/22 11/10 11/17 12/10 14/7 14/19 17/9 17/15 19/2 20/24 23/14 23/17 23/19 23/25 25/20
rights [1] 10/5
risk [4] 6/15 21/14 22/9 22/15
Rizzo [1] 4/15
rocked [1] 5/22
Roofing [1] 13/10
RPR [2] 27/4 27/17
Ruiz [3] 27/4 27/16 27/17
rule [4] 15/14 15/16 15/18 25/17
rules [7] 6/25 9/24 10/2 15/13 15/17 15/18 17/25

RULING [1] 24/7

# S

S-T-A-X-X [1] 13/23
said [6] 8/8 9/11 9/15 11/14 12/24 14/24
same [2] 8/1 15/6
saved [2] 20/13 21/21
say [12] 6/25 7/4 8/23 9/1 9/3 10/18 12/3 15/1 17/25 18/2 23/24 24/24
saying [1] 9/8
says [5] 15/11 15/14 15/19 17/2 17/20
scene [1] 22/13
schedule [2] 21/13 21/19
scope [1] 4/24
second [1] 20/18
seconds [1] 19/3
see [2] 15/14 19/4
seek [1] 12/18
seeks [2] 11/16 15/5
seen [1] 19/25
segregated [1] 6/13
select [1] 21/12

# S

sent [3] 6/4 10/9 11/20
set [6] 13/12 18/15 18/19 20/20 22/2 25/17
setting [2] 21/5 21/7
settled [1] 20/8
several [1] 13/8
she [1] 17/9
should [2] 18/25 25/14
show [5] 8/22 9/18 16/15 19/24 23/13
showed [1] 17/2
shows [2] 8/10 11/9
sic [1] 13/11
similar [1] 24/5
simply [1] 19/24
Since [1] 9/13
sit [1] 12/3
six [1] 18/16
so [13] 4/20 5/21 6/7 7/12 7/18 8/2 8/11 16/3 16/9 16/25 20/9 22/15 24/11
software [5] 4/9 7/24 12/8 12/9 12/11

Solutions [1] 4/10
some [10] 6/12 9/17 10/9 14/7 17/18 18/19 20/10 23/6 23/11 25/5
someplace [1] 25/10
something [1] 24/21
sorry [2] 13/19 23/10
sought [4] 12/20 13/14 17/6 17/6
speak [1] 18/2
specific [1] 14/12
specifically [1] 11/14
spell [2] 4/11 13/21
spending [1] 25/8
spent [2] 6/21 7/14
squarely [1] 24/13
Stand [1] 23/20
standing [1] 8/17
starting [1] 13/9
STATE [2] 27/1 27/5
statute [1] 23/5
StaxxRing [2] 13/17 13/20
stay [4] 23/14 25/7 25/8 25/11
stays [2] 23/15

23/16
still [1] 19/4
stipulate [1] 19/7
streamline [1] 5/23
streamlined [1] 20/1
Stuber [1] 4/8
styled [1] 27/7
submission [1] 25/17
submit [5] 5/11 6/1 7/12 7/22 24/16
submitted [2] 11/23 24/17
subpoenas [1] 11/25
substantially [5] 5/9 11/10 12/23 18/23 24/10
substantive [1] 25/15
succeed [3] 15/21 16/5 16/6
suffered [1] 9/17
suggest [2] 10/3 10/11
suggests [1] 25/5
summary [14] 7/7 8/6 9/25 12/1 12/10 12/16 13/12 15/8 15/15 15/19 15/22

**S**

summary... [3] 15/25 17/12 19/8

support [1] 18/10

Supreme [9] 5/7 8/3 9/5 9/14 11/12 12/22 14/16 17/19 18/4

sure [9] 8/13 9/22 9/24 11/8 19/20 24/16 25/4 25/23 25/24

swapped [1] 10/9

**T**

tab [1] 12/6

tactical [2] 10/5 10/15

take [4] 6/23 19/6 24/4 24/21

taken [9] 6/2 6/22 8/7 10/10 14/11 16/23 19/7 20/5 20/6

talk [2] 11/7 22/20

talked [1] 14/23

talks [2] 24/2 24/3

Taylor [1] 27/12

technical [1] 7/24

tee [1] 21/20

Telephone [1] 27/20

tell [2] 4/6 8/15

tells [1] 23/12

Terminix [2] 18/13 18/14

terms [2] 8/2 15/2

Texas [5] 11/12 27/1 27/5 27/17 27/19

than [8] 6/5 7/14 7/21 7/25 9/20 9/24 10/13 12/15

Thank [5] 4/22 13/25 26/3 26/4 26/5

that [135]

that's [8] 7/18 10/7 15/6 15/12 19/14 22/22 23/25 25/18

their [18] 4/21 5/7 5/9 8/20 10/18 10/19 12/5 12/13 12/17 15/24 16/8 17/15 17/18 18/10 18/25 19/23 20/25 22/4

theirs [2] 8/20 10/21

them [9] 5/10 5/12 15/14 18/12 19/16 20/1 20/13 20/13 25/14

then [9] 4/20 6/13

9/6 9/11 9/13 12/25 21/14 22/18 25/16

theoretically [1] 16/9

there [9] 8/5 8/6 8/7 9/13 11/12 19/25 21/2 21/17 23/2

there's [20] 4/5 5/4 6/18 6/21 7/10 7/18 7/19 7/22 9/14 9/19 10/17 10/20 19/10 19/15 19/17 19/19 20/12 20/22 21/9 24/21

thereof [1] 14/21

these [3] 12/21 16/9 19/8

they [53]

they're [4] 6/25 9/20 15/20 16/10

they've [7] 7/14 14/13 16/8 16/9 17/15 18/23 20/8

thing [5] 17/25 18/14 18/18 19/11 22/18

thing's [1] 21/23

think [20] 8/2 9/13 11/4 11/8 15/24 18/22 18/25 19/10 21/6 23/6 23/8

## T

think... [9]  23/10 23/22 23/23 23/25 24/10 24/12 24/17 25/15 25/18
third [2]  11/24 14/3
third-party [1]  11/24
this [49]
those [5]  11/18 12/15 12/25 13/5 16/4
though [1]  8/5
three [15]  5/18 5/21 7/14 7/15 10/7 10/12 11/12 11/18 11/24 12/1 12/2 14/15 20/5 21/24 21/25
through [2]  10/23 17/24
throw [1]  25/3
Tim [1]  4/15
time [7]  14/19 17/5 17/11 19/16 23/9 23/9 25/14
timely [3]  13/4 13/5 14/9
today [1]  17/19
today's [1]  4/4
told [1]  25/9

too [1]  21/3
total [1]  27/11
totality [1]  13/1
totally [1]  23/1
traditional [1]  12/3
transcription [1]  27/5
trial [11]  6/12 11/17 12/21 17/7 18/19 20/16 21/9 21/22 22/15 23/15 25/7
true [3]  15/12 19/15 27/5
truly [1]  27/9
try [1]  22/18
trying [1]  12/11
twice [1]  13/12
two [4]  12/2 12/25 17/10 20/10
Typically [2]  19/15 19/17

## U

under [10]  6/25 8/8 8/24 9/23 10/2 18/4 18/14 24/2 24/4 24/13
understand [4]  9/10 22/1 22/23 23/2
understandable [1]  5/17

understood [2]  16/16 16/18
unfair [2]  10/5 10/15
unfairness [4]  8/24 8/25 14/25 15/1
unfortunately [1]  22/21
unjustifiably [1]  10/4
unless [1]  23/15
until [2]  6/17 8/16
up [6]  6/17 15/10 21/15 21/15 21/20 24/20
upon [1]  21/18
us [12]  4/6 5/12 5/19 8/22 9/23 11/21 15/9 16/14 19/24 20/7 21/4 25/8
usually [1]  19/15

## V

V-O-G-E [1]  4/12
valid [1]  4/23
versus [4]  4/3 13/17 13/19 20/23
very [8]  4/23 6/17 8/3 10/9 12/9 16/19 25/21 26/5
Vesta [2]  8/4 11/13
Voge [2]  4/8 4/9

**V**

volume [1] 27/7

**W**

wait [2] 9/11 25/12
waited [3] 14/18 16/25 17/9
waiting [3] 5/13 19/4 20/13
waive [1] 8/9
waived [9] 5/1 9/12 10/22 11/9 12/14 13/10 14/1 17/9 17/15
waiver [5] 8/12 8/23 9/17 13/16 18/20
waives [1] 11/17
want [6] 7/5 19/12 22/5 22/20 23/24 24/21
warranties [1] 12/14
was [17] 5/17 6/3 6/8 7/16 8/14 8/15 9/8 10/13 13/12 14/1 16/18 18/14 18/14 18/15 18/18 20/25 22/13
wasn't [1] 7/16
waste [1] 22/20
wasted [1] 22/21

water [1] 6/6
way [6] 9/5 9/11 9/12 24/9 25/16 25/18
we [40]
we're [5] 4/16 6/22 10/4 11/5 21/9
we've [26] 4/23 4/24 6/1 6/5 6/21 6/22 7/2 7/5 7/7 7/8 10/3 10/9 10/11 10/22 10/23 13/7 18/4 19/5 19/25 20/1 20/1 20/9 20/13 21/19 21/20 22/21
Wednesday [1] 24/24
welcome [1] 25/17
well [3] 6/25 12/24 21/3
were [8] 5/18 9/9 9/25 12/3 15/8 18/15 22/4 27/8
weren't [1] 17/24
West [2] 4/2 4/16
WGMA [1] 12/8
WGMA's [1] 12/7
what [5] 15/6 15/16 17/20 21/8 25/15
what's [3] 11/5

21/25 22/22
whatsoever [2] 9/19 20/13
wheel [1] 7/14
when [8] 5/17 10/13 14/18 14/23 15/4 17/3 17/9 20/15
where [6] 8/4 8/25 9/15 13/8 13/10 14/1
whether [1] 19/14
which [15] 6/1 6/9 8/17 9/4 9/25 10/18 11/21 12/6 15/2 15/3 16/22 17/5 17/7 24/4 27/7
while [1] 25/12
who [2] 4/6 4/6
wholly [1] 18/11
why [7] 5/17 8/14 8/17 9/10 22/13 24/15 24/16
will [15] 5/11 6/1 6/23 7/12 7/21 7/22 18/2 19/18 22/6 22/6 24/22 25/13 25/17 26/1 27/12
within [1] 18/16
without [2] 20/3 20/7
WITNESS [1]

## W

WITNESS... [1] 27/14
won't [1] 19/8
word [1] 19/3
words [2] 17/22 22/10
worse [2] 9/1 9/20
worth [1] 21/8
would [21] 4/6 6/10 6/11 6/13 7/25 9/20 9/23 10/1 13/21 15/11 15/14 15/25 16/1 17/17 20/6 23/2 24/14 24/18 24/20 25/7 25/11
wouldn't [2] 15/23 18/7
WRIGHT [1] 27/12
writing [1] 27/6
written [2] 10/10 13/13
wrong [1] 12/4

## Y

y'all [1] 24/16
yeah [3] 16/17 20/19 21/6
year [2] 10/13 19/12

years [8] 5/22 7/14 7/15 10/7 10/12 17/10 20/6 21/24
yes [11] 5/2 8/14 11/4 15/18 16/6 23/1 24/25 25/1 25/1 25/2 25/23
you [72]
you're [1] 16/10
you've [7] 9/16 9/16 9/17 20/10 20/11 24/15 24/17
you-all [1] 25/15
your [27] 4/11 4/14 4/20 6/11 9/12 11/4 12/5 13/7 15/7 15/12 16/21 19/23 20/11 20/18 20/18 21/8 22/10 23/11 24/1 24/12 24/15 24/18 24/19 24/22 24/25 25/2 26/4